[No. E042188. Fourth Dist., Div. Two. Mar. 11, 2008.]

DANIEL VILLANUEVA, Plaintiff and Appellant, v.
CITY OF COLTON, Defendant and Respondent.

**COUNSEL**

Woodson & Allen and William N. Woodson for Plaintiff and Appellant.

Best, Best & Krieger and John D. Higginbotham for Defendant and Respondent.

OPINION

MILLER J.—

## INTRODUCTION

Daniel Villanueva was employed by the City of Colton (the City) as a lead operator in its wastewater division. After being demoted to operator II, he sued the City under the California Fair Employment and Housing Act (FEHA) (Gov. Code,[1] § 12940 et seq.), alleging discriminatory and retaliatory employment practices. The City filed a motion for summary judgment, which was granted, as was its motion for attorney fees. (§ 12965.) On appeal, Villanueva maintains that he produced substantial direct and circumstantial evidence sufficient to withstand summary judgment. Further, he contends that in awarding nearly $40,000 in attorney fees, the court failed to take into account his inability to pay such a sizable sum. We disagree with both contentions and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Between 1989 and 1996, Villanueva was employed by the City, first in its sanitation division, and later in its street maintenance division. In June 1996, when the City outsourced its refuse operation to a private contractor, Villanueva was laid off. The following month he was rehired by the City on a probationary basis as an operator-in-training in its wastewater division. Prior to his rehire, he purportedly negotiated an agreement with a manager in human resources whereby he was assured that his break in service would not affect his seniority and benefits. Thereafter, he worked his way "up the ladder" and in 2000 was promoted to lead operator.

In September 2002, Villanueva was at work at the wastewater plant when he heard an alarm relating to the in-plant return pump station. As lead operator, he reviewed the computer readouts and the pumps' control panel. After attempting without success to silence the distress signal, he concluded it was a false alarm. Without notifying the plant manager, he left the treatment plant in an alarm condition overnight. As a result, the City was required to report a violation of its National Pollutant Discharge Elimination System permit to the California Regional Water Quality Control Board. As it turned out, had he conducted a proper investigation, he would have immediately known that it was *not* a false alarm. For his role in the incident, Villanueva was suspended, without pay, for a period of five working days.

---

[1] Further statutory references are to the Government Code unless otherwise indicated.

In 2003, faced with an anticipated budget shortfall, the City implemented a reduction in force, which resulted in the elimination of approximately 36 positions. As part of the plan, the director of the wastewater division selected several positions to be eliminated, including one of two lead operator positions. Pursuant to a memorandum of understanding (MOU) with the employees' bargaining group, it was determined that the lead operator with less seniority—based upon "continuous service in a full-time position"— would be laid off, subject to any "bumping rights" he might have. The director of human resources determined that Martin Guerrero, who in 1994 had been hired into what is now the wastewater division, was the lead operator having more seniority. Noting that Villanueva had a break in service in 1996 when he was laid off from one department and rehired into a different department as a new probationary employee, the director rejected Villanueva's position that his private understanding with a prior director of human resources ensured that his rehire would not affect his seniority. In any event, the director found that even if such an agreement had been made, it was unenforceable and would be "trumped" by the MOU.[2] Thereafter, Villanueva exercised his bumping rights and moved into a position as operator II, paying $1.34 less per hour.

On April 19, 2005, Villanueva filed his complaint against the City. As a first cause of action, he alleged that the City had engaged in discriminatory conduct in failing to promote him, and in falsely and unjustifiably reprimanding, demoting, suspending and evaluating him, after which he voiced objections to a manager of the City. He further alleged that in taking this action, he was engaging in protected activity, and that the City, in engaging in the aforementioned conduct, violated section 12940 in that it discriminated against him on the basis of his race, national origin, ethnicity or skin color. As a second cause of action, he alleged that on several occasions he had informed the City that he believed he was the victim of discrimination, and

---

[2] In her July 29, 2003, interoffice memorandum directed to Villanueva, Teresa Delgado, manager of human resources, acknowledged, "the file contains a memorandum dated October 1, 1996, from Personnel Director Gracie Harmon requesting approval for continuous service, such approval was given solely for the purpose of computing vacation accrual. Ms. Harmon based this request on the language found in the MOU covering that period and made the commitment for a continuance for no purposes other than vacation accrual. However, this request arguably should not have been approved, since you were on probationary status at that time and your probation did not end until February 11, 1997. The later decision to allow your longevity pay was based, in part, on the same memorandum. In these two incidents, the City committed an administrative error by granting you benefits to which you were not entitled. [¶] Nevertheless, the City's position is that the damage arising from these errors is limited because the issues of vacation accrual and longevity pay relate to you, the individual employee. More importantly, the City never entered into any similar agreement with you regarding seniority. The City would not enter [into] a seniority agreement with one employee because such agreements have the potential to impact a large number of City employees."

that as a result of that action the City had retaliated against him by demoting, suspending, and unjustly reprimanding him.

In August 2005, the City filed an answer to the complaint, offering a general denial as to all allegations and 20 affirmative defenses. A year later, the City filed its motion for summary judgment. The essence of the City's position was that, in light of the negligent manner in which Villanueva handled the 2002 alarm incident, and the elimination of Villanueva's position due to the City's anticipated budget shortfall and resulting reduction in force, it had legitimate nondiscriminatory reasons for its actions in suspending Villanueva and for removing a lead operator position, and Villanueva lacked evidence of pretext necessary to survive summary judgment.

In opposing summary judgment, Villanueva submitted declarations purporting to demonstrate both direct and indirect evidence of racial bias and retaliatory intent. In addition to his own declaration, he offered a declaration of his former manager, Lawrence Perales, who had also sued the City alleging discriminatory employment practices (the Perales case). Further, he offered deposition testimony from his division manager, William Roth, and his department director, Eric Fraser, as well as his deposition testimony and that of three former City employees given in the Perales case.

The City filed objections to numerous paragraphs in the two proffered declarations on various grounds, including hearsay, lack of foundation, and relevancy. The City also objected to the deposition transcripts submitted on behalf of Villanueva, asserting that they were neither the original nor certified copies, but rather, "were generated from some sort of computer program." Further, the City objected to the deposition transcripts in the Perales case, contending they were impermissible pursuant to Code of Civil Procedure section 2025.620, subdivision (b). Moreover, the City argued there was no evidence of racial discrimination, noting that Villanueva conceded at his deposition that he had never heard Roth make any derogatory remarks about Hispanics, and it also presented evidence that grievances lodged by Villanueva in 1998 and 2003 said nothing about race discrimination or harassment based on race.

After sustaining all but one of the City's objections, the court granted the motion. It found that the City offered legitimate, nondiscriminatory reasons for both Villanueva's suspension and the elimination of his position, and that Villanueva failed to present any substantial evidence that the City's reasons were pretextual. Said the court: "[Villanueva] makes unsupported charges of race discrimination against a number of people. However, the proffered information offered in support of that is significantly hearsay and the Court has dealt with that by way of ruling on the objections." The following month,

the court granted the City's motion for attorney fees, finding no evidence of "racial animus or other impermissible employment activity," and ordered Villanueva to pay to the City the sum of $39,472.30.

## DISCUSSION

### A. *Summary judgment was proper.*

On appeal from a summary judgment, "we review the record de novo, considering all the evidence set forth in the moving and opposition papers *except that to which objections have been made and sustained.* [Citation.] Under California's traditional rules, we determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law. [Citations.]" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089], italics added (*Guz*).)

■ Where, as here, a plaintiff alleges employment discrimination and bases his claim on circumstantial evidence, we apply what has come to be known as the *McDonnell Douglas*[3] test to determine whether the evidence supports an inference of discrimination or whether the employer, as the moving party, is entitled to judgment as a matter of law. (*Guz, supra,* 24 Cal.4th at p. 356.) An employer moving for summary judgment may do so by setting forth competent, admissible evidence to show legitimate, nondiscriminatory reasons for its action. (*Id.* at p. 357.) It is then the employee's burden to rebut the employer's showing by pointing to evidence which raises an inference that intentional discrimination did occur. "[A] plaintiff's showing of pretext, combined with sufficient prima facie evidence of an act motivated by discrimination, may permit a finding of discriminatory intent, and may thus preclude judgment as a matter of law for the employer. [Citation.]" (*Id.* at p. 361, italics omitted.)

■ Thus, to warrant summary judgment, the City was required to provide competent, admissible evidence that it had legitimate, nondiscriminatory reasons for its actions in suspending Villanueva after the 2002 alarm incident and, as a result of its anticipated multimillion-dollar budget shortfall, in eliminating Villanueva's position as lead operator as part of its 2003 reduction in force. This it did. The evidence is uncontroverted that Villanueva was negligent in addressing the issues presented by the alarm incident, thereby

---

[3] *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817].

justifying his brief suspension. Moreover, the law is settled that an employer's depressed economic condition "can be good cause for discharging [an] employee." (*Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1732 [35 Cal.Rptr.2d 181].) Accordingly, the City having done its part, it was Villanueva's burden to rebut the City's showing by demonstrating that the reasons for the City's actions were pretextual.

"Pretext may be demonstrated by showing '. . . that the proffered reason had no basis in fact, the proffered reason did not actually motivate the discharge, or, the proffered reason was insufficient to motivate [the] discharge. [Citation.]' [Citation.]" (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 224 [87 Cal.Rptr.2d 487], fn. omitted.) "An employee in this situation can not 'simply show the employer's decision was wrong, mistaken, or unwise. Rather, the employee " 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for the [. . . asserted] non-discriminatory reasons." [Citations.]' [Citations.]" [Citation.]' [Citation.]" (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 75 [105 Cal.Rptr.2d 652].)

In an effort to show that the City's reasons were pretextual, Villanueva relies exclusively upon evidence excluded by the trial court. That is, pointing to statements contained in the various declarations and depositions submitted in opposition to the City's motion (e.g., that Fraser blamed "Mexicans" for throwing grease down the drains causing the City's sewer lines to become clogged, and refused to acknowledge Hispanic employees, and that Roth often used racial epithets in describing Hispanics), Villanueva maintains that he presented the court with both direct and indirect evidence of racial bias, and substantial evidence of retaliation. He does not dispute that the events surrounding the alarm incident played out the way the City contends. Rather, his sole contention is that there was no established protocol for responding to alarms and that his former manager, Perales, believed that his suspension was a " 'joke.' " Nor does he contest the fact a reduction in force was implemented by the City. Rather, he argues the City's position that "the 'demotion' was driven by 'dire economic' conditions is belied by [his] proof that he had an 'agreement' with the City of Colton that his seniority and his benefits would not in any way be lessened due to his break in service."

We need not belabor Villanueva's efforts to establish that the City's reasons were pretextual. Suffice it to say, our task in undertaking a de novo review in this case has been simplified in that virtually every piece of

evidence submitted by Villanueva in opposing summary judgment was excluded in response to the City's objections. Stripped of the excluded evidence, there is absolutely nothing to support his theory. Moreover, evidence was presented that the City would not have entered into such an agreement, as it would have potentially impacted a large number of other employees, including Guerrero, the other lead operator whose job was unaffected by the reduction in force. Additionally, because Guerrero is also Hispanic, there is simply no reason to believe that the decision to "bump" Villanueva rather than Guerrero was based on race.

More importantly, Villanueva does not now challenge the propriety of those evidentiary rulings. As the City puts it, the trial court's rulings "effectively gutted Villanueva's arguments of any evidentiary support." Indeed, "[w]here a plaintiff does not challenge the superior court's ruling sustaining a moving defendant's objections to evidence offered in opposition to the summary judgment motion, 'any issues concerning the correctness of the trial court's evidentiary rulings have been waived. [Citations.] We therefore consider all such evidence to have been "properly excluded." [Citation.]' [Citation.]" (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 140 [127 Cal.Rptr.2d 145], fn. omitted.)

The only evidentiary ruling which Villanueva *does* challenge is the one pertaining to his declaration in which he alleged that he " 'personally heard [Roth] refer to African Americans as "fucking niggers", Hispanics as "fucking Mexicans" or "fucking Hispanics" and women as "fucking cunts." . . .' " The City objected to that portion of the declaration on the ground it was inconsistent with Villanueva's deposition testimony wherein he said he had *never* heard Roth make derogatory comments of this nature. In his opening brief, Villanueva contests that ruling, contending that the remarks were not hearsay because they were not offered for the truth. However, he ignores the basis of the court's ruling. As the City explains, "The trial court saw that flip-flop for what it was, and properly excluded it, based on well-settled case law that a plaintiff cannot create a triable issue of fact and thereby escape summary judgment by contradicting his own prior testimony."[4] Quoting from *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1120 [75 Cal.Rptr.2d 27] (*Guthrey*), the City reminds us that " '[a]dmissions or concessions made during the course of discovery govern and control over contrary declarations lodged at a hearing on a motion for summary judgment.' "

---

[4] The City suggests that Villanueva's race discrimination theory is something he contrived by means of a "logically flawed process of elimination." The City refers to Villanueva's deposition testimony that he believed he was a victim of race discrimination because "[t]here doesn't appear to be any other reason why the cuts needed to be made." Later, after conceding that he never raised the race issue with anyone in management, Villanueva testified "there doesn't appear to be any other reason why I would be treated that way. . . ."

The City cites *Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107 [29 Cal.Rptr.3d 127] as being "particularly noteworthy, as it highlights precisely what is wrong with Villanueva's opening brief." In that case, the plaintiff appealed a summary judgment, but failed to "affirmatively challenge the trial court's evidentiary ruling, and demonstrate the court's error." (*Id.* at p. 1114.) Moreover, in an effort to demonstrate triable issues of fact, she continued to rely on the stricken evidence in her opening brief, as if the appellate court were required to give that evidence a de novo review. (*Id.* at p. 1113.) Quoting *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65–66 [99 Cal.Rptr.2d 316, 5 P.3d 874], the reviewing court pointed out—as we have indicated above—that in conducting a de novo review, the appellate court may consider all of the evidence presented in the moving and opposing papers " 'except that to which objections were made and sustained.' " (*Ibid.*, italics omitted.) Moreover, where the plaintiff does not challenge the ruling sustaining the evidentiary objections, any issue with regard to the correctness of that ruling is deemed waived. (*Roe*, at p. 1114.) The court explained: "The reason for this rule is that '[t]rial courts have a duty to rule on evidentiary objections.' [Citation.] '[R]uling on such evidentiary objections can involve a number of considerations more suited to the trial court than the appellate courts, including an exercise of discretion in establishing the record to be reviewed de novo.' [Citation.]" (*Ibid.*)

In his reply brief, Villanueva acknowledges the position taken by the City, but argues nonetheless, "it is well established that the trial court is not in the business of making credibility determinations, several key pieces of evidence ignored by the trial court were either classic discriminatory comments, and were thus not hearsay, or were 'admissions' under the law as coming from the mouth of Colton's managers." He then essentially rehashes his position as asserted in his opening brief, while attempting to explain away his failure to challenge the trial court's evidentiary rulings. He asserts: "While [the City] below and the trial judge chose to pass these things off as irrelevancies this evidence might have convinced a trier of fact that the reasons for [his] discipline was not legitimate business, but discrimination or retaliation. [¶] The evidence of racial bias should not have been dismissed, or stricken, or ignored. These statements are not hearsay, since [they] were certainly not offered for the truth of the matters asserted in the statements. Nevertheless the trial court excluded the evidence. Now, [the City] argues [he] had no such evidence." He insists that he "made strong objection to these particular key rulings in the opening brief by pointing out that the key evidence was either direct evidence of bias, or that it came from [the City's] own manager, Perales. . . . This is enough to object to the rulings for the purposes of this appeal on the specific areas discussed in the opening brief." It is not. Simply put, Villanueva has done nothing to challenge the trial court's various rulings excluding his proffered evidence.

Also in his reply brief, Villanueva cites and then attempts to distinguish the decision in *Carnes v. Superior Court* (2005) 126 Cal.App.4th 688 [23 Cal.Rptr.3d 915].[5] In *Carnes,* the trial judge granted summary judgment "without *any* specification of the reasons for doing so, then directing counsel for the prevailing party to prepare an order 'includ[ing] and [*sic*] all findings necessary to support th[e] order,' without telling the prevailing party what any of those 'findings' should be. [¶] The impropriety of the judge's action in this case is highlighted by the fact that the judge granted the motion for summary judgment without having made any rulings on the parties' evidentiary objections, even though the parties requested such rulings at the hearing." (*Id.* at pp. 692–693.) The court continued: "Certainly it is not improper for a judge to adopt as his or her own the reasoning a defendant proposes for granting a motion for summary judgment, provided that reasoning is sound and the judge critically evaluates the reasoning before adopting it. Where, as here, however, a judge simply grants the motion, then asks the prevailing party to provide the court with the reasoning that will support that result, confidence in the court's integrity is seriously and legitimately undermined." (*Id.* at p. 693.)

Relying on language from *Carnes,* Villanueva contends the trial court "simply adopted the [City's] suggested wholesale exclusion of entire paragraphs of evidence at once." To the contrary, the trial court here—unlike the court in *Carnes*—expressly ruled on the City's (as well as Villanueva's) objections. Moreover, Villanueva does not—in either his opening or reply brief—present argument as to why the trial court's evidentiary rulings were improper. Rather, he contends only that, unlike *Carnes,* he "does object to specific evidentiary rulings as stated in the opening brief. The trial court simply ignored substantial evidence of bias, and differential mistreatment, and retaliatory intent which had a profoundly prejudicial effect on the outcome of the case." Villanueva's argument misses the mark. In short, he has utterly failed to present proper argument and citations to authority as to why the trial court's evidentiary rulings were wrong. Accordingly, in reviewing the propriety of summary judgment, we consider none of the evidence offered by him in the trial court.

 In any event, and notwithstanding the foregoing, Villanueva's claim of retaliation fails because there is no evidence that he ever engaged in a protected activity related to an employment practice proscribed by the FEHA. In order to make a prima facie showing of retaliation, the plaintiff must show that he engaged in a protected activity, that the employer subjected him to an adverse employment action, and that a causal link exists between the protected activity and the employer's action. (*Akers v. County of San Diego*

---

[5] Villanueva does cite *Carnes* in his opening brief as well, but only for the proposition the appellate court reviews the trial court's evidentiary rulings for abuse of discretion.

(2002) 95 Cal.App.4th 1441, 1453 [116 Cal.Rptr.2d 602].) In his complaint, Villanueva alleged he had informed the City of his belief that he was the victim of racial discrimination and that the City retaliated against him by demoting him. However, the record is devoid of evidence that he ever complained to anyone about alleged racial discrimination or did anything to imply that racial discrimination was an issue. "Standing alone, an employee's unarticulated belief that an employer is engaging in discrimination will not suffice to establish protected conduct for the purposes of establishing a prima facie case of retaliation, where there is no evidence the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in discrimination." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1046 [32 Cal.Rptr.3d 436, 116 P.3d 1123].)

Villanueva contends his failure to use the phrase "racial discrimination" in his grievances does not preclude him from concluding it was race discrimination as a basis for filing his lawsuit. His position is unfounded. Two formal grievances were lodged in 1998 and 2003 through his association representative, neither of which alleged racial discrimination or harassment based on race. When asked at his deposition if his 1998 grievance (which challenged the manner in which overtime was being allocated) was based on race, he replied: "At the time? I don't know. Now? Possibly."

Nonetheless, insisting that the fact he failed to mention "race discrimination" in either of his grievances is not controlling, he cites *Gifford v. Atchison, Topeka and Santa Fe Ry. Co.* (9th Cir. 1982) 685 F.2d 1149, 1157. There, the trial court concluded that the plaintiff's "initial failure to label [an offensive employment practice] as sex-discrimination indicated that her opposition to it was actually based on other grounds." (*Id.* at p. 1156.) Finding that the trial court "analyzed the opposition issue incorrectly" (*ibid.*), the Court of Appeal stated: "It requires a certain sophistication for an employee to recognize that an offensive employment practice may represent sex or race discrimination that is against the law. Here, [the plaintiff] argued from the outset that the collective bargaining agreement had a harsher impact on some of the women than it had on men. . . . [A]n employee who complains of a practice that has a disproportionate impact on a protected group complains of unlawful discrimination . . . ." (*Id.* at p. 1157.) Villanueva's reliance in this case is inapt, as his failure to use the term "race discrimination" is irrelevant. Rather, what is controlling is the fact that the *substance* of his grievances was not conduct which had anything at all to do with discrimination of this nature.

B. *The court did not abuse its discretion in awarding attorney fees to the City, nor are we able to discern, on this record, any error in determining the amount of the award.*

█ Section 12965, subdivision (b), authorizes an award of reasonable attorney fees and costs to the prevailing party in an action brought under the FEHA. "A trial court's award of attorney fees and costs under this section is subject to an abuse of discretion standard. [Citations.]" (*Cummings v. Benco Building Services* (1992) 11 Cal.App.4th 1383, 1387 [15 Cal.Rptr.2d 53] (*Cummings*).)

In requesting attorney fees, the City asked the court to find that Villanueva's lawsuit "was not brought and maintained with objective reasonable cause," and that it was "unreasonable, frivolous, meritless, groundless and vexatious." In opposing the request, and insisting that his lawsuit was brought in good faith, Villanueva argued that the City failed to demonstrate that he is financially able to withstand a fee award: "Typically, no one would expect a wage earner at a public employer to be able to withstand such an award." However, Villanueva offered neither a declaration nor evidence of any kind to support his position.

In reply to Villanueva's "inability to pay" argument, the City said, "[I]t simply isn't so." Citing various personnel records, the City argued that Villanueva earns considerably more than the average American and that repaying the City's attorney fees "will hardly subject him to financial ruin." Further, the City indicated that, if the court had any concern with the amount of the award, it would gladly accept whatever amount the court deemed appropriate.

In granting the request, the court found that the action was in fact "unreasonable, frivolous and meritless. . . . [¶] While [Villanueva] submitted his own and other declarations in opposition to the motion, those declarations, and the exhibits appended thereto, once stripped of argument, conjecture and other inadmissible content left a dearth of information upon which a reasonable person could possibly advance a colorable claim for employment discrimination. [Villanueva's] deposition testimony . . . speaks volumes in this regard. While it appears that [Villanueva] is apparently a disgruntled employee, this court finds there is no evidence, substantial or otherwise to support the claims advanced. [¶] [Villanueva] botched the September 2002 alarm incident. He was suspended. Others were terminated. No racial overtones appear, even remotely, with respect to this situation. Later, [Villanueva's] position was eliminated due to reduction in force. People lost their jobs. [Villanueva] stayed on by virtue of 'bumping rights.' Again, no evidence of racial animus or other impermissible employment activity was produced. This

lawsuit was frivolous at its outset, maintained unreasonably, and meritless as aforesaid. [¶] The attorney fees charged are reasonable, both with respect to hours spent and per hour rate. [The City] is awarded $39,472.30 under the provisions of Government Code [section] 12965."

On appeal, Villanueva contends the award itself was error in that his case was not filed or maintained in an egregious fashion. The thrust of his position is that, because there was no legitimate reason for his demotion or suspension, he did nothing wrong in initiating this lawsuit. We have already concluded otherwise. The circumstances in *Bond v. Pulsar Video Productions* (1996) 50 Cal.App.4th 918 [57 Cal.Rptr.2d 917] are analogous. There, in affirming an award of attorney fees, the court said: " 'I think the evidence was clear that there wasn't anything discriminatory by Mr. Bailey [Pulsar's owner]. He was . . . dragged through several days of trial, I think, and attorney's fees needlessly. [¶] People shouldn't have to do that. There was no evidence at all that your client—there was no evidence at all even that he should have believed he was being discriminated against. There is just nothing at all.' " (*Id.* at p. 924.) That court also found the case was " 'not a good faith prosecution of a discriminatory action.' " (*Ibid.*) Here too, for reasons already stated, the City's entitlement to an award of attorney fees under the statute cannot seriously be questioned. Indeed, the record reflects overwhelming evidence that the lawsuit was unfounded, unreasonable, and frivolous.

Additionally, Villanueva contends reversal is required because the court failed to consider his ability to pay. Citing *Rosenman v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro* (2001) 91 Cal.App.4th 859, 868 [110 Cal.Rptr.2d 903] (*Rosenman*), Villanueva contends a trial court is required to take into consideration the plaintiff's ability to pay when making a fee award under the FEHA. *Rosenman* involved an employee who alleged pregnancy discrimination against her employer. A fee award in favor of the defendant was reversed, the appellate court finding insufficient evidence that the underlying action was frivolous, unreasonable or groundless. Noting that the trial court had failed to make written findings, the reviewing court "impose[d] a nonwaivable requirement that trial courts make written findings reflecting the *Christiansburg/Cummings* standard[6] in every case where they award attorney fees in favor of defendants in FEHA actions." (*Rosenman*, at p. 868.) The

---

[6] The *Rosenman* court explained: "The *Christiansburg* [*Garment Co. v. EEOC* (1978) 434 U.S. 412, 421 [54 L.Ed.2d 648, 98 S.Ct. 694]] court concluded 'a district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.' In *Cummings*, we agreed and cautioned ' "such awards should

court went on to say that "given the important public policy issues served by FEHA are necessarily implicated in a trial court's decision to make an attorney fees award in an antidiscrimination case, we are convinced such findings are required in order to ensure those public policy issues are not thwarted. Therefore, where the required findings are not made by the trial court, the matter must be reversed and remanded for findings, unless the appellate court determines no such findings reasonably could be made from the record." (*Ibid.*, fns. omitted.) In a footnote, the court added "[t]he trial court should also make findings as to the plaintiff's ability to pay attorney fees, and how large the award should be in light of the plaintiff's financial situation." (*Id.* at p. 868, fn. 42.) In making this observation, the court "wholeheartedly agree[d]" (*ibid.*) with the holding in *Patton v. County of Kings* (9th Cir. 1988) 857 F.2d 1379, 1382 (*Patton*).

■ In responding to Villanueva's position, the City takes exception to *Rosenman*'s directive that the trial court make ability-to-pay findings. The City contends Villanueva's reliance on the *Rosenman* footnote is misplaced in that *Rosenman* relied on *Patton*, a non-FEHA case. The City further argues that in *Patton*, the plaintiff requested a hearing regarding his ability to pay and the court denied the request. Thus, argues the City, the *Patton* court suggested that a trial court consider the financial resources of a plaintiff before awarding fees to the prevailing defendant, but cautioned that " 'a district court should not refuse to award attorney's fees to a prevailing defendant . . . solely on the ground of the plaintiff's financial situation.' " (*Patton, supra,* 857 F.2d at p. 1382.) We do not read *Patton* so narrowly. Rather, and notwithstanding that court's position that a plaintiff's financial situation ought not be the basis of a decision *not* to award fees to a prevailing defendant, we believe the opinion stands for the proposition a plaintiff's financial resources must be taken into consideration before determining the final award.

As Villanueva aptly points out, the *Rosenman* court did not simply relegate its decision to a footnote. Rather, in the body of its opinion, the court explained that it refused to "establish a bright-line rule whereby a plaintiff who survives a motion for summary judgment or nonsuit can *never* be liable for attorney fees. Such a rule would unjustifiably shield those plaintiffs who

be permitted 'not routinely, not simply because he succeeds, but only where the action brought is found to be unreasonable, frivolous, meritless or vexatious.' " ' " (*Rosenman, supra,* 91 Cal.App.4th at pp. 865–866, fns. omitted.)

The *Rosenman* court also acknowledged *Christiansburg*'s directive that in applying the criteria for awarding attorney fees, the trial court must " 'resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success.' " (*Rosenman, supra,* 91 Cal.App.4th at p. 865.)

are able to raise a triable issue of fact, even though it be by means of fabricated evidence and false testimony. If the false and unfounded nature of such a plaintiff's claims is revealed at trial, the prevailing defendant should be able to recoup its attorney fees *to the extent the plaintiff is able to pay*." (*Rosenman*, *supra*, 91 Cal.App.4th at p. 866, second italics added.)

In *Jersey v. John Muir Medical Center* (2002) 97 Cal.App.4th 814 [118 Cal.Rptr.2d 807], attorney fees were awarded, and in so doing the court's sole explanation was that it had previously determined by summary judgment that the action was without merit. (*Id.* at p. 831.) The reviewing court found the award to be improper for two reasons. First, the lack of merit is not a proper standard for awarding fees against a losing plaintiff. Secondly, the court failed to make express findings to support an award. (*Cummings*, *supra*, 11 Cal.App.4th at p. 1388; *Rosenman*, *supra*, 91 Cal.App.4th at pp. 867–868.) Acknowledging that the absence of findings in some cases need not require a remand for the purpose of making those findings, the court found that that was true there. Based on the record before it, the court was unable to find any evidence that the lawsuit was frivolous, unreasonable, or groundless. (*Jersey*, at p. 832.) Moreover, and although in light of the reversal there was no need to reach the ability-to-pay issue, it is noteworthy that the court acknowledged the *Rosenman* requirement as to explicit findings on that issue. (*Id.* at p. 831, fn. 4.)

We agree with the rationale of *Rosenman*. Because the majority of cases under the FEHA involve litigants who would not have the financial means to prosecute this type of case, the public policy behind the FEHA is served by not discouraging them from pursuing the litigation by potentially imposing fees that could easily devastate them financially simply because a few file frivolous claims. Thus, a plaintiff's ability to pay must be considered before awarding attorney fees in favor of the defendant.

Notwithstanding the foregoing, the City contends Villanueva failed to present evidence of his *inability* to pay; thus, "[t]he trial court cannot be expected to make findings based on evidence which Villanueva failed to submit." Further, the City argues that the limited evidence which was available to the court actually supports the premise that Villanueva has the ability to pay, i.e., the personnel records submitted along with the summary judgment motion showed that Villanueva earned $25 per hour plus benefits, which is "considerably more . . . than the average American." Thus, the City argues that "[r]epaying the City's modest attorney's fees in this case will hardly subject him to financial ruin." In reply, Villanueva infers that it was the City's burden to demonstrate that he "could financially withstand the requested fee award. Typically, no one would expect a wage earner at a public employer to be able to withstand such an award."

The City's argument is persuasive. Although the court was privy to Villanueva's salary, as provided by the City along with its fee request, Villanueva offered no evidence of any kind which might have warranted a reduced fee award. Indeed, in responding to the City's request, he easily could have offered a declaration setting forth his gross income, his net income, his monthly expenses, his assets, or any other information which he thought would lend support to his position. He failed to do so. Thus, while we are confident that a trial court has an obligation to consider a losing party's financial status before assessing attorney fees under the FEHA, on the record before us we are unable to say that the court's fee award was an abuse of discretion.

Finally, citing *Guthrey*, *supra*, 63 Cal.App.4th 1108, the City asks us to award it attorney fees pursuant to section 12965 and Code of Civil Procedure section 128.7, for responding to Villanueva's meritless appeal. It maintains "[t]his lawsuit should never have been filed. After suffering a well-deserved loss on summary judgment, Villanueva should have licked his wounds and cut a deal. Instead, he kept fighting, and fought his way into a $39,472.30 liability. Undaunted, he filed this half-baked, frivolous appeal." In *Guthrey*, *supra*, 63 Cal.App.4th 1108, the Court of Appeal having found that the appellant "has presented no issue in this appeal which has any arguable merit" (*id.* at p. 1126), granted the respondent's request for fees under section 12965 and remanded the matter to the trial court to set the amount. (*Guthrey*, at p. 1127.) In an unpublished portion of its decision, the court affirmed an award of more than $64,000 in attorney fees. In granting the request, the court noted that the defendant had not asked for an award of sanctions against the appellant for filing a frivolous appeal. (*Id.* at pp. 1126–1127.) Here, the City is asking for attorney fees under both section 12965 and Code of Civil Procedure section 128.7, which authorizes sanctions for the filing of a frivolous appeal. While we agree with the trial court that Villanueva's lawsuit was frivolous, we cannot say the same about his appeal. Indeed, although we have rejected his contention the trial court erred in awarding fees against him without considering his financial status, the fact remains that his appeal raises an arguable issue as to whether, and under what circumstances, a trial court is required to consider a plaintiff's ability to pay when awarding fees under section 12965. Accordingly, insofar as the City's request for attorney fees is grounded on its position that Villanueva's appeal was frivolous,[7] the request is denied.

---

[7] In denying the City's request, we are mindful that sanctions may be appropriate even where the appeal is only partially frivolous. (See, e.g., *People ex rel. Dept. of Transportation v. Outdoor Media Group* (1993) 13 Cal.App.4th 1067, 1080 [17 Cal.Rptr.2d 19].)

## DISPOSITION

The judgment and order are affirmed. The City is awarded costs on appeal.

McKinster, Acting P. J., and King, J., concurred.

A petition for a rehearing was denied April 4, 2008, and appellant's petition for review by the Supreme Court was denied June 18, 2008, S162827. George, C. J., Werdegar, J., and Corrigan, J., did not participate therein.