Filed 8/10/16  Gonzalez v. Los Angeles Lakers CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| FERNANDO GONZALEZ, | B265823 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC546722) |
| v. | |
| THE LOS ANGELES LAKERS, INC. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Rolf Treu and Stephen M. Moloney, Judges.  Affirmed.

Law Offices of Lisa Maki, Lisa Maki, Alex DiBona and Jennifer Ostertag for Plaintiff and Appellant.

Littler Mendelson, Michael A. Gregg, Mustafa El-Farra and Thomas J. Whiteside for Defendants and Respondents.

_____

Appellant Fernando Gonzalez sued his current employer, respondent Los Angeles Lakers, Inc. (Lakers), and supervisor, respondent Tim Harris, for violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). After taking appellant's deposition, respondents filed a motion for sanctions under Code of Civil Procedure section 128.7, which was granted. The trial court dismissed Harris from the action, dismissed several causes of action, and imposed monetary sanctions. It then granted Lakers' motion for summary judgment, entered judgment in its favor, and granted respondents' post judgment motion for attorney fees. (Gov. Code, § 12965, subd. (b).) In this appeal from the judgment and post judgment order, Gonzalez challenges the summary judgment ruling and attorney fee award. For the reasons discussed below, the summary judgment and order awarding respondents' attorney fees are affirmed.

**FACTUAL AND PROCEDURAL BACKGROUND**

Lakers hired Gonzalez as its Spanish language play-by-play radio announcer in 1996, when he was 35 years old. He was born in Mexico and his native language is Spanish. Until the 2012-2013 season, Gonzalez's Spanish radio commentary could be heard on television through a technology called secondary audio programming (SAP), and his salary included a percentage of Lakers' SAP revenue. As will be explained, Lakers ceased providing Spanish language radio commentary for television during the 2012-2013 season, and Gonzalez stopped receiving SAP income.

In 2011, Lakers contracted with Time Warner Cable Sports to broadcast its games beginning with the 2012-2013 season on two new cable television networks, one in English and another—Time Warner Cable Deportes (Deportes)—in Spanish. Lakers reserved the right to select the Deportes Spanish language basketball announcers subject to Time Warner approval. In 2011, Gonzalez spoke with his former colleague, Time Warner executive Pablo Urquiza, regarding his interest in a play-by-play commentator position with Deportes. Urquiza, who had worked with Gonzalez for two or three years at KMEX Univision, recommended someone else for the position. Lakers selected

2

Garcia Marquez, who was recommended by Urquiza, as the Deportes play-by-play commentator. Gonzalez, then over age 50, complained to Harris that the younger Marquez had been selected because of his age.

Given the loss of SAP revenue, Gonzalez's contract for the 2012-2013 season provided only half his previous salary. Gonzalez complained to Harris about the loss of SAP income, and was assured that Time Warner would provide sufficient assignments to make up for the lost SAP income. In fact, the additional assignments provided by Time Warner, including Sparks games, for the 2012-2013 season resulted in an increase in Gonzalez's income. But the following season, Gonzalez suffered a $30,000 reduction in income because of cuts by Time Warner in his additional assignments. Gonzalez asked Harris for help in restoring his lost income, and although assured by Harris that everything would be fine, he felt that Harris was treating him differently. He was disappointed that Harris did not help resolve his issues with Time Warner, allow him to fly on the team jet to away games (he announced away games from a studio in Los Angeles), or grant his requests to hire a producer and statistician for his radio show.

During this period, Gonzalez complained to Jeff Proctor, an independent consultant to Lakers, about the reduction in additional assignments from Time Warner. Proctor told him that Urquiza was angry about his extra income from Time Warner and he "shouldn't complain about it." Proctor discussed Gonzalez's situation with Urquiza and Mark Shuken, another Time Warner executive, and advised Gonzalez to set aside his "Latino pride" and ask Urquiza for more work. Proctor told Gonzalez, "[i]f you're nice to [Urquiza], he's going to give you more days." In response to Proctor's observation that "you feel more pride about [these] things," "[y]ou don't want to go and ask for [more work]," Gonzalez admitted, "well, yeah, that's the way we are." Proctor encouraged Gonzalez to forget "your Latino pride. I can see you Latinos are like that way. Don't be like that. Go and talk to [Urquiza] and forget your Latino pride."

Gonzalez testified that Proctor's repeated references to "Latino pride" were offensive. But he conceded that he did not ask for more work "[b]ecause of my Latino— Latino pride. I don't think I should beg to get more work. I didn't."

3

Gonzalez filed a complaint with DFEH in 2014, alleging claims for discrimination based on age, national origin, and race; harassment; retaliation; and failure to prevent discrimination or retaliation. After receiving a right to sue letter, Gonzalez brought a civil lawsuit against Lakers, Harris, Time Warner, Urquiza, and Shuken in May 2014. In addition to FEHA claims, the complaint alleged causes of action for violation of Civil Code section 52.1, declaratory relief, fraudulent inducement, and negligent misrepresentation.

At deposition, Gonzalez testified that Harris had engaged in unlawful age discrimination by selecting Marquez, who was younger, as the Deportes play-by-play commentator. When asked whether anyone in the Lakers organization had made a derogatory remark concerning his age, race, or national origin, Gonzalez answered no. He testified that he was offended by Proctor's repeated references to Latino pride, but did not complain to Proctor or anyone else about the remarks.

In response to the question, "Do you believe you were harassed by anyone at the Lakers?" Gonzalez testified, "Yes, one time." In November 2012, Harris had spoken to him about reTweeting "a comment from Magic Johnson saying [coach] Mike D'Antoni doesn't fit the Lakers." Harris had admonished him by saying "Do you know who is making your checks? Do you know who is paying your salary?" This made him feel "really, really bad, like I'm a stupid person, and I felt that he was ready to fire me." He was forbidden to Tweet about the Lakers for 30 days. He conceded that Harris was justified in his actions and did not say "anything about my age, the color of my eyes, color of my skin. He just said . . . he wasn't happy with the Tweet."

In November 2014, Lakers asked Gonzalez to dismiss Harris from this action and to withdraw his claims for "age discrimination, harassment, civil rights, fraudulent inducement and negligent misrepresentation." Citing Gonzalez's deposition testimony, Lakers argued there was no factual basis for these claims. In December 2014, Lakers

4

served a motion for sanctions (Code Civ. Proc., § 128.7),[1] and filed the motion after the 21-day safe harbor period had expired.

Before the motion for sanctions was heard, Gonzalez dismissed Time Warner, Urquiza, and Shuken from the case, all with prejudice, on December 31, 2014. Gonzalez dismissed Harris without prejudice the following month.

In March 2015, the trial court awarded Lakers $13,924.12 in sanctions under Code of Civil Procedure section 128.7. The court dismissed Harris with prejudice, and

---

[1] Subdivision (b) of section 128.7 provides: "By presenting to the court, whether by signing, filing, submitting, or later advocating, a pleading, petition, written notice of motion, or other similar paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, all of the following conditions are met: (1) It is not being presented primarily for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. (2) The claims, defenses, and other legal contentions therein are warranted by existing law or by a not frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law. (3) The allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. (4) The denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief."

Subdivision (c) of Code of Civil Procedure section 128.7 provides: "If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation. In determining what sanctions, if any, should be ordered, the court shall consider whether a party seeking sanctions has exercised due diligence. (1) A motion for sanctions under this section shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). Notice of motion shall be served as provided in Section 1010, but shall not be filed with or presented to the court unless, within 21 days after service of the motion, or any other period as the court may prescribe, the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected. If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees."

dismissed the causes of action for harassment, violation of Civil Code section 52.1, fraudulent inducement, and negligent misrepresentation.

Lakers, the sole remaining defendant, moved for summary judgment or summary adjudication of the remaining causes of action: discrimination based on age, national origin, and race; retaliation; failure to prevent discrimination and retaliation; and declaratory relief.

*Discrimination Based on Age.* This claim was based on the selection of Marquez, who is younger than Gonzalez, as play-by-play commentator for Deportes. Lakers argued the claim was untimely because the DFEH complaint was filed more than a year after Gonzalez had learned of Marquez's selection. Gonzalez argued it was timely under the continuing violation doctrine, and referred to Lakers' post-litigation hiring of a younger "man well under the age of 40, who is Argentinian," to handle its Twitter account. The trial court declined to consider this new information because it was not alleged in the complaint. It held that the continuing violation doctrine did not apply to the isolated hiring of a play-by-play announcer. It granted summary adjudication of this cause of action based on the statute of limitations.

*Discrimination Based on Race and National Origin.* These claims were based in part on the selection of Marquez, who is Hispanic, for the Deportes position. In its motion, Lakers argued that it had legitimate, non-discriminatory reasons for hiring Marquez based on the recommendations of Time Warner and Urquiza, who had "in-depth knowledge of the Spanish language broadcast market and knowledge of Adrian Garcia Marquez's background and experience in television." Moreover, as a former colleague of Gonzalez, Urquiza also possessed knowledge of Gonzalez's background and experience.

*Discrimination Based on Disparate Treatment.* The evidence before the court regarding allegations of disparate treatment based on race and national origin included:

- "Of the Lakers' current eight announcers, four are Hispanic, two are Black and two are White."
- During his first year as a Spanish language radio announcer, Gonzales was not depicted on the big screen before home games in the same manner as

6

Chick Hearn. From his second year and thereafter, his picture was displayed on the big screen, but he had to ask that this be done.

- Gonzalez did not receive a 2000 Championship ring free of charge until he discussed the issue with Chick Hearn. Altogether, he received five free championship rings.

- Gonzalez was not denied access to the Family Room, but did not receive access to it until he asked for it in 2004.

- Gonzalez did not begin receiving season tickets until the 2004/2005 season, when he first asked for them.

- He has received valet parking since 2003.

- He has never asked for access to team practice sessions which, generally, are closed to the media.

- He has been invited to attend the NBA annual meeting every year since 2008.

- He always receives per diem when he travels. He received per diem late sometime between 2009 and 2011, but that did not interfere with his ability to do his job.

- His job does not require him to do one-on-one interviews.

- The last time he sought to interview Kobe Bryant was in 2002/2003.

- He is paid on the basis of the number of games he works per season.

- He is paid less than his Anglo counterparts.

- His Lakers salary is based on revenue generated by the Spanish language radio broadcast.

- He has no knowledge of the revenue generated by the Lakers' Spanish language radio broadcast compared to the Lakers' English radio broadcast.

- The revenue generated from Lakers' Spanish language radio broadcasts is significantly less than the revenue generated by the English language broadcasts.

*Discrimination Based on Race and National Origin.*  The trial court found that because Lakers had produced evidence of a legitimate nondiscriminatory business reason for hiring Marquez—he was recommended by Time Warner and Urquiza—Gonzalez was required to demonstrate that the employer's explanation was a pretext for unlawful discrimination based on race or national origin.  But Gonzalez failed to meet this burden; he did not "submit any evidence of a weakness, implausibility, inconsistency, incoherency, or contradictions in the Lakers' proffered reasons [citation] or that raises triable issues of fact that discriminatory animus was a substantial motivating factor [citation]."  Accordingly, the court granted summary adjudication of the claims for discrimination based on race and national origin.

*Retaliation.*  Gonzalez asserted that his pay was cut in retaliation for his complaints to Harris and Proctor about the reduced number of assignments he was receiving from Time Warner.  The evidence submitted by Lakers showed that the reduction in pay was tied to the loss of SAP income, and was not motivated by any desire to retaliate against Gonzalez for having engaged in a protected activity.  The trial court granted summary adjudication of this cause of action, stating:  "Plaintiff's opposition fails to dispute any of the Lakers' evidence concerning retaliation."

*Discrimination Based on Other Claims.*  Based on the previous rulings, the trial court concluded the claims for failure to prevent, declaratory judgment, and punitive damages were derivative and, therefore, also subject to summary adjudication.

Finding no triable issue of material fact, the trial court (Judge Treu) granted Lakers' motion for summary judgment in its entirety.  Lakers and Harris then moved for attorney fees under Government Code section 12965, subdivision (b).  They requested a lodestar of $728,696 with a multiplier of .50, and, after subtracting the previous award of sanctions, sought a net award of $340,156.38.  After reducing this amount, the trial court (Judge Moloney) entered a fee award of $121,547.58, plus costs of $6,604.18.  Gonzalez filed a timely appeal from the judgment and post judgment order.

8

## DISCUSSION

In FEHA employment discrimination cases, the plaintiff has the initial burden at trial of establishing a prima facie case. Although the elements vary according to the circumstances, in general the plaintiff must show that he or she belongs to a protected class, is qualified for the position sought, suffered an adverse employment action, such as termination, demotion, or denial of an available job, and some other circumstance suggesting a discriminatory motive. (*Guz v. Bechtel National, Inc*. (2000) 24 Cal.4th 317, 355.) Once a prima facie case is established at trial, a rebuttable presumption of discrimination arises, and the employer has the burden of demonstrating that it acted for a legitimate, nondiscriminatory reason. (*Id.* at pp. 355–356) "If the employer sustains this burden, the presumption of discrimination disappears. [Citations.] The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. [Citations.]" (*Id.* at p. 356.)

When an employer moves for summary judgment in a FEHA employment discrimination action, the burdens of production are reversed. (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 309.) The employer has the initial burden of showing "'either that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors[.]'" (*Ibid.*) If the employer meets this burden, the plaintiff must then provide evidence which creates "'*a triable issue of fact material to the defendant's showing.*'" (*Ibid.*)

On appeal, we review the trial court's summary judgment ruling de novo, and independently examine the record to determine whether there is a triable issue of material fact. We view the evidence and inferences in the light most favorable to appellant. (*Sandell v. Taylor-Listug, Inc., supra,* 188 Cal.App.4th at p. 308.)

## I

The applicable limitations statute under FEHA requires the plaintiff to file an administrative complaint within one year of the date when "the alleged unlawful practice or refusal to cooperate occurred." (Gov. Code, § 12960, subd. (d).) Because Gonzalez

9

filed his administrative complaint more than one year after Marquez was selected for the Deportes position, the cause of action for age discrimination is untimely unless an exception applies.

To avoid the bar of the statute of limitations, Gonzalez relies on the continuing violation doctrine. This doctrine "comes into play when an employee raises a claim based on conduct that occurred in part outside the limitations period." (*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 812 (*Richards*).) *Richards* involved an employer's alleged failure to accommodate an employee's disability over a period of five years. The timeliness of the complaint in *Richards* depended on whether the employer's actions qualified for treatment as a single course of conduct. The test, according to *Richards*, is whether "the employer's unlawful actions are (1) sufficiently similar in kind . . . ; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence. [Citation.]" (*Richards*, *supra*, 26 Cal.4th at p. 823.)

The first two factors—degree of similarity and frequency—are more relevant in cases involving repetitive misconduct, such as sexual harassment or hostile work environment. (See, e.g., *Richards v. CH2M Hill*, *Inc.* (2001) 26 Cal.4th 798, 817 [discussing cases such as *Accardi v. Superior Court* (1993) 17 Cal.App.4th 341, which applied continuing violation doctrine to sexual harassment]; *Madison v. IBP*, *Inc.* (8th Cir. 2003) 330 F.3d 1051 [hostile environment claims by their nature involve repeated conduct].) The third factor—degree of permanence—is more relevant in cases, where, as here, the plaintiff was denied a particular job opportunity. The denial of an employment position is a discrete act that is "easy to identify" and constitutes a separate actionable wrong. (*National R.R. Passenger Corp. v. Morgan* (2002) 536 U.S.101, 114.) In *Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031 (*Cucuzza*), for example, the plaintiff was denied a certain employment position, and the finality of the employer's decision became apparent by the time her job title changed. Because the plaintiff in *Cucuzza* did not file her lawsuit within one year of that date, the action was untimely. (*Id.* at p. 1043.)

10

This case is similar. The continuing violation theory is inapplicable to discrete acts such as the denial of a particular job opportunity. (*Cucuzza*, *supra*, 104 Cal.App.4th at p. 1043.) When Gonzalez learned in either 2011 or 2012 that Marquez had been selected as the Deportes play-by-play announcer, the loss of that opportunity was sufficiently apparent to constitute a separate actionable wrong. Because the DFEH complaint was not filed until 2014, it was barred by the one year statute of limitations. (*Ibid.*) Because the claim was time-barred, any subsequent hiring decision—such as the selection of a younger employee for the Twitter position—would not restart the clock. To the extent the recent hiring of a younger employee supports a theory of liability not alleged in the complaint, Gonzalez was required to make a timely request in the trial court for leave to amend, which he did not do. (See *Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1264–1265 [plaintiff did not seek leave to amend complaint before the hearing on defendant's summary judgment motion, and it was too late to seek leave to amend for the first time on appeal].)

**II**

As to the claims for discrimination based on race and national origin, Lakers provided evidence of its non-discriminatory business reason for selecting Marquez as the Deportes play-by-play announcer: It relied on the recommendation provided by Time Warner and Urquiza, who are knowledgeable about the industry and familiar with Marquez's background and experience.

In order to prove that Lakers' evidence of non-discriminatory reasons was pretextual, Gonzalez was required to show that the employer's asserted reasons were false, and that the real reason was unlawful discrimination. A plaintiff "has the burden to produce 'substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.' [Citation.] [¶] The plaintiff must do more than raise the inference that the employer's asserted reason is false. '[A] reason cannot be proved to be "a pretext for discrimination" unless it is shown

11

*both* that the reason was false, and that discrimination was the real reason.' [Citation.] If the plaintiff produces no evidence from which a reasonable fact finder could infer that the employer's true reason was discriminatory, the employer is entitled to summary judgment. [Citation.]" (*Hicks v. KNTV Television, Inc*. (2008) 160 Cal.App.4th 994, 1003.)

The record lacks evidence of discriminatory behavior or motive. When asked at deposition whether anyone in the Lakers organization had made derogatory remarks concerning his age, race, or national origin, Gonzalez answered no. He provided no evidence to discredit the explanation for Marquez's hiring, or to show that the real reason was intentional discrimination. Given that four of the eight current broadcasters, including Marquez and Gonzalez, are Hispanic, Gonzalez's failure to rebut Lakers' evidence of its nondiscriminatory reason for hiring Marquez defeats his claims.

### III

Gonzalez claims to have engaged in protected activity when he complained to Proctor and Harris about the reduction in assignments by Time Warner, and to have been subjected to an adverse employment action by his employer—the loss of SAP income—as a result of his protected activity. We conclude that summary judgment was properly granted.

Retaliation claims under FEHA are subject to the same burden-shifting analysis as discrimination claims. (*Yanowitz v. L'Oreal USA*, *Inc.* (2005) 36 Cal.4th 1028, 1042.) Here, the evidence showed that Gonzalez's reduction in income was tied to the elimination of revenue from SAP, a technology rendered obsolete by the new Spanish language cable television network. There is no indication the Deportes network was created as an act of intentional discrimination, nor any sign that Gonzalez's loss of income was the result of retaliation by his employer.

The remaining claims—punitive damages, failure to prevent discrimination and retaliation, and declaratory judgment—are derivative of the other causes of action. We conclude summary judgment was properly granted for the reasons discussed above.

# IV

Lakers and Harris assert that appellate jurisdiction over the July 10, 2015 post-judgment order is lacking because, even though the notice of appeal refers to a post judgment order, it does not identify the order by date or subject matter. The cases cited in support of this contention are distinguishable. In *DeZerega v. Meggs* (2000) 83 Cal.App.4th 28, 43, for example, the notice of appeal did not refer to a post judgment order. By contrast, the notice in this case contained an express designation of an appeal from a post judgment order, which was adequate to provide notice.

Government Code section 12965, subdivision (b) authorizes an award of reasonable attorney fees and costs to the prevailing party in a FEHA case. A trial court has discretion to award attorney fees to a prevailing defendant in such a case only "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." (*Cummings v. Benco Building* Services (1992) 11 Cal.App.4th 1383, 1387, quoting *Christiansburg Garment Co. v. EEOC* (1978) 434 U.S. 412, 421.) "[I]f a plaintiff is found to have brought or continued such a claim in bad faith, there will be an even stronger basis for charging him with the attorney's fees incurred by the defense." (*Christiansburg*, at p. 422.) In awarding fees, the court must consider the plaintiff's ability to pay. (*Villanueva v. City of Colton* (2008) 160 Cal.App.4th 1188, 1202–1203.) The award is reviewed for abuse of discretion. (*Cummings*, at p. 1387.)

The trial court found the harassment and retaliation claims were groundless. The lack of merit of both claims was made clear by Gonzalez's deposition testimony. He conceded that Harris was justified in addressing the November 2012 Tweet concerning coach D'Antoni, which was the only incident identified as constituting harassment, and that nothing improper was said by Harris during their conversation. Gonzalez also admitted that no one within the Lakers organization had made a remark in his presence regarding his national origin, race, or age.

The request for fees was supported by partially redacted billing records, which the trial court reviewed and apportioned to the claims that were found to be baseless. The

13

trial court properly considered the entire record when it reduced the amount requested from $340,156.38 to $121,547.58.

Gonzalez contends he "could not afford to pay attorneys' fees of $340,000." He ignores the actual amount of the fee award, $121,547.58. In his opening brief, Gonzalez cites pages 144 to 1,847 of the appellant's appendix in support of his contention that the amount of the fee award would subject him to "financial ruin." Providing no explanation beyond a bare citation to over 1,000 pages in the record, Gonzalez has failed to establish an abuse of discretion.

## DISPOSITION

The judgment and post judgment order are affirmed. Respondents are awarded costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EPSTEIN, P. J.

We concur:


WILLHITE, J.


COLLINS, J.

14