Filed 1/20/15  Gonzalez v. 3M Unitek Corp. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| ALEJANDRA GONZALEZ,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>3M UNITEK CORPORATION,<br><br>  Defendant and Respondent. | B253735<br><br>(Los Angeles County<br>Super. Ct. No. BC493991) |


APPEAL from a judgment of the Superior Court of Los Angeles County, Michelle R. Rosenblatt, Judge.  Affirmed.

Law Offices of Ramin R. Younessi, Ramin R. Younessi, Glen H. Mertens, Allison M. Schulman and Christina Coleman for Plaintiff and Appellant.

Seyfirth Shaw, Laura Wilson Shelby, Kiran Aftab Seldon and Jamie Chanin Pollaci for Defendant and Respondent.

_____

# INTRODUCTION

Plaintiff and appellant Alejandra Gonzalez was employed as an at-will machine operator by defendant and respondent 3M Unitek Corporation (3M). After working for several years in that position, Gonzalez began experiencing severe pain in her right arm, right shoulder, and neck, which she believed to be caused by the continuous and repetitive arm movements required by her job. After 3M rotated Gonzalez through various assignments and placed her on several periods of disability leave, including a period of leave lasting more than two years, it terminated her employment after determining there were no available positions matching her qualifications and pay grade that she was able to perform with or without accommodation for her medical restrictions. Gonzalez sued 3M for, among other things, wrongful termination and violations of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).[1] The trial court granted 3M's motion for summary judgment and entered judgment in favor of 3M. We affirm.

# FACTUAL BACKGROUND

In September 2007, 3M hired Gonzalez as an at-will machine operator in its manufacturing plant in Monrovia, California, where the company manufactures orthodontic products. As a machine operator, Gonzalez was required to weld components of 3M's work orders. To complete these tasks, Gonzalez frequently performed continuous and repetitive movements with her arms and hands.

Between April 2008 and February 2009, Gonzalez took three medical leaves of absence for various medical reasons, each ranging from five to seven days. After each leave, 3M allowed Gonzalez to return to her previous position without any change in pay.

Around May 2009, Gonzalez began experiencing pain in her neck and right shoulder, which she believed was caused by the continuous and repetitive movements

---

[1] All further statutory references are to the Government Code unless otherwise specified.

required for her welding assignments. Gonzalez consulted two doctors for her pain and submitted several disability claim forms to 3M during May and June 2009. As a result, 3M placed Gonzalez on paid medical leave from May 13 through July 1, 2009.

When Gonzalez returned to work in July 2009, her doctors imposed medical restrictions on her working conditions that required her to regularly alternate tasks, change physical positions, and stretch. 3M allowed Gonzalez to utilize these restrictions when she returned to her previous assignment. Nevertheless, Gonzalez soon complained to one of 3M's nurses that she could not work through her pain even when she utilized her restrictions.

On July 21, 2009, Gonzalez consulted another doctor about her pain. The doctor issued her a note releasing her from work for two days. On July 23, 2009, she consulted the same doctor, who issued a second note restricting her to a desk job.

When Gonzalez returned at the end of July 2009, 3M assigned her to a position that allowed her to sit while she worked but still required her to make repetitive movements with her arms while assembling products. Gonzalez continued to experience severe pain while she worked, and she again complained to 3M's nurse. She was then reassigned to a position that allowed her to alternate between various assembly-line duties.

Despite being rotated through positions, Gonzalez continued to experience pain and was placed on medical leave for nearly two weeks, from August 4, 2009 through August 17, 2009. By the time Gonzalez returned to work near the end of August 2009, another doctor had imposed additional restrictions on her working conditions, requiring her to avoid flexing and extending her cervical spine for a prolonged period of time and prohibiting her from lifting objects weighing more than 10 pounds.

Between August 2009 and February 2010, 3M rotated Gonzalez through several assignments that allowed her to alternate between sitting and standing positions and did not require her to flex or extend her spine for prolonged periods of time. Throughout this time, Gonzalez participated in 3M's daily employee-led stretching program, and 3M allowed Gonzalez to stand up and stretch whenever she needed.

On February 15, 2010, Gonzalez was again placed on medical leave due to severe pain she continued to experience in her right arm, lower back, and neck. Although Gonzalez's leave was originally set to end on March 28, 2010, 3M allowed her to remain on leave for more than two years, until August 2012, when her employment was terminated. During this period, several of Gonzalez's doctors cleared her to return to work at various times; however, after meeting with 3M on several occasions, Gonzalez was allowed to remain on leave after she expressed that she could not return to work due to the excruciating pain she continued to experience. 3M continued to pay Gonzalez throughout this period of leave. For the first three months, 3M paid Gonzalez her regular wages; for the remaining period of leave, 3M supplemented Gonzalez's disability payments she was receiving from the state to ensure that her payments never dropped below 60 percent of her normal wages.

In April 2011, Gonzalez underwent neck surgery to fuse one of her cervical discs. Following her surgery, Gonzalez's medical leave was extended through June 2011. On June 3, 2011, one of Gonzalez's doctors issued a disability status report authorizing her to return to work with the following restrictions: "No lifting greater [than] 10 pounds for right upper extremity and no prolong[ed] upward or downward gaze until 6-23-11 and regular duty as of 6-24-11." As of June 3, 2011, 3M did not have any available positions that could accommodate Gonzalez's restrictions, so Gonzalez remained on medical leave.

On July 21, 2011, Dr. John C. Steinmann cleared Gonzalez to return to work with no restrictions. However, Gonzalez informed Hilda Reyes, 3M's human resources manager, that she did not believe she could begin working again because she was still experiencing intolerable pain when she used her right arm and right shoulder. Reyes told Gonzalez that she should continue resting and consulting her doctor until she felt better.

4

On July 29, 2011, Dr. Steinmann issued a permanent and stationary status report,[2] which stated that Gonzalez had reached a point of "maximum medical improvement," and that she was not able to return to her usual and customary duties. The report also stated that Gonzalez should receive a prophylactic restriction precluding her from engaging in the repetitive use of her upper right arm. According to the report, Gonzalez continued to experience pain in her head, neck, right shoulder, and right hand, as well as numbness and a tingling sensation running from her right arm through the fingertips of her right hand.

Reyes received Dr. Steinmann's July 29, 2011 permanent and stationary status report. According to her, there were no vacant positions in any department at 3M's Monrovia plant at the time she received the report. However, she and members of 3M's management internally discussed creating a new full-time position, or vacating a position occupied by a contract worker employed by a third party and converting that position into a full-time assignment for Gonzalez.

After Reyes received Gonzalez's permanent and stationary status report, she consulted with Charlie Nguyen, 3M's Monrovia plant manufacturing product manager, who had also received the report, to review existing but non-vacant positions at the Monrovia plant that could potentially accommodate Gonzalez's restrictions. Reyes and Nguyen ultimately selected five positions that they believed Gonzalez was qualified to perform based on her skills and work history at 3M, as well as her work history at her previous places of employment.[3] Those positions were: (1) Production Operator in 3M's

---

[2]     """A disability is considered permanent after the employee has reached maximum improvement or his condition has been stationary for a reasonable period of time."' [Citation.]" (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 220, fn. 2 (*Hanson*).)

[3]     Prior to working at 3M as a full-time employee, Gonzalez held the following positions: a salesperson at a clothing store; a cashier assistant at Costco; a secretary responsible for handling only paperwork at an audio store; a product painter for an orthopedic-product manufacturer; and an accountant's assistant and secretary in Mexico. During her deposition, Gonzalez testified that she is not entirely fluent in English.

5

Bands department; (2) Senior Production Operator in 3M's Precoat department; (3) Senior Welder Operator in 3M's Preweld department; (4) Senior Production Operator in 3M's Brazed Assembly department; and (5) Production Operator Specialist in 3M's Wire department.

Even though none of these positions were available at the time, Reyes and Nguyen concluded Gonzalez would nevertheless not have been able to perform the essential functions of the first four positions due to her no-repetitive-use restriction. According to 3M's official job descriptions, each of the positions involved manual tasks that would have required constant and repetitive movement of Gonzalez's entire right arm. Reyes and Nguyen were not aware of any modifications that could have been made to these positions to accommodate Gonzalez's restrictions. As for the Production Operator Specialist position, Reyes and Nguyen removed it from their consideration because placing Gonzalez in that position would have required 3M to promote her to a higher pay grade.

After consulting with Nguyen, Reyes informed Gonzalez that there were no positions available at 3M's Monrovia plant that could accommodate her no-repetitive-use restriction. Gonzalez then requested that 3M terminate her employment so that she could collect unemployment benefits, but Reyes denied the request. 3M then placed Gonzalez on inactive status and allowed her to remain on medical leave.

On September 15, 2011, Gonzalez consulted Dr. Steinmann to request that he lift her permanent restrictions and authorize her to return to her regular duties at 3M. Dr. Steinmann refused Gonzalez's request because he believed that she remained at a point of maximum medical improvement and that lifting her restrictions would exacerbate her injuries. Dr. Steinmann issued a report continuing Gonzalez on her prior permanent and stationary work status.

On January 5, 2012, Gonzalez again consulted Dr. Steinmann to request that he lift her permanent restrictions. According to Gonzalez, she believed that returning to her regular duties would enable her to take her mind off of her pain. Dr. Steinmann granted Gonzalez's request and issued a report stating that Gonzalez could return to work with no

6

restrictions.  However, the report also stated that Gonzalez's work status remained as "per permanent and stationary."

After receiving Dr. Steinmann's January 5, 2012 report, Gonzalez informed Reyes that she had been cleared to return to work.  Reyes told Gonzalez that 3M had no positions available at that time, but that the company would contact her if any positions became available.

When 3M's third-party claims manager received Dr. Steinmann's January 5, 2012 report, she requested clarification from Dr. Steinmann because the report appeared contradictory, as it stated that Gonzalez's work status remained "permanent and stationary" but also stated that Gonzalez was able to return to work without restrictions.  On January 30, 2012, Dr. Steinmann responded with a letter stating that he had recently examined Gonzalez and determined that she had "recovered well enough to resume her usual and customary duties."

On February 7, 2012, Gonzalez returned to Dr. Steinmann for another consultation because she continued to experience severe pain in her right shoulder that precluded her from working for more than five minutes at a time.  Dr. Steinmann then issued a new status report stating that he "would like to amend [his] prior opinion and place [Gonzalez] at her previous permanent and stationary status with the work restriction of no overhead use of the right upper extremity."

3M allowed Gonzalez to remain on medical leave for another six months, until it terminated her employment in August 2012.  3M began the process of terminating Gonzalez's employment after 3M's disability coordinator informed Reyes that all of Gonzalez's available leave had expired.  Reyes reviewed Gonzalez's leave notices, permanent restrictions, and 3M's relevant job descriptions to determine whether Gonzalez could return to work.  Reyes later discussed this information with Nguyen and Bob Manneman, 3M's Monrovia plant manager, at which point they decided to recommend Gonzalez's termination to 3M's employee relations manager.

On August 13, 2012, 3M sent Gonzalez a letter terminating her employment. The letter stated that 3M was terminating Gonzalez's employment because she was no longer eligible for medical leave, and she remained unable to return to work with or without reasonable accommodation. The letter also informed Gonzalez that 3M had filled her previous position because the company had been unable to hold the position open indefinitely. According to Gonzalez, the date she received her termination letter was the first time she had been contacted by 3M since January 2012.

## PROCEDURAL BACKGROUND

### Gonzalez's Complaint

On October 11, 2012, Gonzalez, through her attorney, submitted a discrimination complaint with the California Department of Fair Employment and Housing (DFEH), requesting a right to sue 3M for disability discrimination. That same day, DFEH issued Gonzalez a right to sue letter.

On October 17, 2012, Gonzalez filed a lawsuit against 3M, alleging six causes of action stemming from her termination: (1) breach of the covenant of good faith and fair dealing; (2) disability discrimination in violation of FEHA; (3) wrongful termination in violation of public policy; (4) retaliation; (5) failure to provide a reasonable accommodation in violation of FEHA; and (6) failure to engage in a good-faith interactive process in violation of FEHA. The complaint alleged that Gonzalez suffered lost earnings and benefits, and general damages in the form of physical and psychological injuries, which would require her to incur ongoing medical expenses. As to the second through fourth causes of action, Gonzalez sought punitive damages, alleging that her superiors at 3M acted with malice and oppression when they terminated her employment.

### 3M's Motion for Summary Judgment

3M moved for summary judgment or in the alternative summary adjudication. 3M argued that Gonzalez could not prevail on her claim for breach of the covenant of good faith and fair dealing because she did not have an employment contract with 3M. With respect to Gonzalez's FEHA claims, 3M argued that she could not prevail on any of the claims, alleging that she failed to exhaust her administrative remedies because she did not

8

certify her discrimination complaint filed with DFEH. With respect to Gonzalez's request for punitive damages, 3M argued that it was undisputed that no 3M employee acted with malice, fraud, or oppression in terminating Gonzalez's employment.

3M also sought summary adjudication of Gonzalez's FEHA, retaliation, and wrongful termination claims on the ground that Gonzalez's medical restrictions and work experience rendered her unable to perform the essential functions of any position for which she was qualified. In other words, 3M argued that it was undisputed that there were no reasonable accommodations available that both suited Gonzalez's medical restrictions and matched her qualifications.

In support of its motion, 3M submitted the following material: Gonzalez's deposition testimony; declarations executed by Reyes, Nguyen, Manneman, 3M's third-party claims manager, and 3M's regional employee relations manager; copies of 3M's official job descriptions for the five positions considered by Reyes and Nguyen; and numerous medical reports issued by Gonzalez's doctors, including Dr. Steinmann's February 7, 2012 primary and stationary status report. In that report, Dr. Steinmann observed: "When I last saw [Gonzalez] she had a desire to return to work without restrictions. It was my opinion that the patient showed improvement with good strength and motion and felt that she should be given the opportunity to try and return. However, according to [Gonzalez], she states that she is unable to work more than five minutes. I am unsure at this point if she is even working. This patient continues to exhibit abnormal-illness behavior and is unreliable when it comes to describing her symptoms. At this point, I would like to amend my prior opinion and place her at her previous permanent and stationary status with the work restriction of no overhead use of the right upper extremity." The report lists Gonzalez's "disability status" as "No overhead use of the right upper extremity." Although the February 7, 2012 report does not reference Gonzalez's no-repetitive-use restriction, during her deposition, Gonzalez testified that, after February 7, 2012, she was subject to both the no-overhead-use and no-repetitive-use work restrictions.

9

**Gonzalez's Opposition**

In her opposition to 3M's motion, Gonzalez argued, among other things, that a triable issue existed as to whether 3M discriminated against her on the basis of her physical disability when it terminated her employment in August 2012 after her disability leave expired. She also argued that triable issues existed as to whether 3M failed to reasonably accommodate her medical restrictions and failed to engage in a good-faith interactive process. Specifically, Gonzalez asserted that Reyes's and Nguyen's evaluations of only five positions as potential accommodations for Gonzalez's medical restrictions was inadequate to establish that 3M could not reasonably accommodate Gonzalez's restrictions. She also claimed that Reyes and Nguyen failed to adequately consider whether 3M could convert one of the contract positions occupied by third-party employees into a full-time position that could accommodate her medical restrictions. She further asserted that Reyes failed to adequately communicate with her between July 2011, when her first permanent medical restrictions were issued, and August 2012, when her employment was terminated, to satisfy 3M's obligation to engage in a good-faith interactive process.

With her opposition, Gonzalez submitted her own declaration in which she stated that, leading up to, and at the time of, her termination, she was capable of performing without restrictions her previous kits, staging, welding, boxing, and pre-coat positions, as well as positions as Senior Welder Operator in the Preweld department, Senior Production Operator in the Facebow department, Senior Production Operator in the Bands department, and Production Operator in the Brazed Assembly department. She also stated that she was able to perform without restrictions numerous contract positions at 3M's Monrovia plant.

Gonzalez also submitted her own deposition testimony, as well as the deposition testimony of Reyes, Nguyen, 3M's third-party claims manager, and 3M's regional employee relations manager. Gonzalez further submitted numerous documents, including medical reports issued by her doctors and a list of contract positions at 3M's

10

Monrovia plant denoting the department in which each position was located and the date each position was filled.[4]

Finally, Gonzalez submitted official job descriptions for numerous positions at 3M's Monrovia plant. Four of the positions located in Gonzalez's pay grade did not list overhead work as a physical demand, but did list repetitive motion of the worker's arms and hands as a physical demand. Those positions were: Senior Welder Operator in the Preweld department; Senior Production Operator in the Facebow department; Production Operator in the Bands department; and Senior Production Operator in the Brazed Assembly department. The Senior Production Operator position in the Punch Press department, which was also located in Gonzalez's pay grade, did not list repetitive motion of the worker's arms and hands as a physical demand, but did list overhead work as a physical demand.

**3M's Evidentiary Objections**

In response to Gonzalez's opposition, 3M objected to the portions of Gonzalez's declaration in which she stated that she was able to perform the essential functions of certain contract and non-contract positions at 3M's Monrovia plant without medical restrictions. 3M objected to these statements on the grounds that they were irrelevant, lacked foundation, and called for expert opinion.

**The Trial Court's Rulings**

Prior to ruling on the motion for summary judgment, the trial court sustained 3M's objections to Gonzalez's declaration.[5] The trial court then granted summary judgment

---

[4]    The list of contract positions did not specify the physical demands for each contract position or whether any of the contract positions had been vacated since the time they were filled.

[5]    During oral argument, Gonzalez's counsel argued the statements made in Gonzalez's declaration to which the trial court sustained 3M's objections constitute evidence from which a triable issue was raised as to Gonzalez's ability to perform the essential duties of certain positions at 3M. However, in her opening and reply briefs, Gonzalez does not argue that the trial court erred in sustaining 3M's objections.

for 3M.  With respect to Gonzalez's claim for breach of the covenant of good faith and fair dealing, the court found that it was undisputed that Gonzalez did not enter into an employment contract with 3M.  The court also found there was no evidence demonstrating that Gonzalez was able to perform, with or without accommodation, any vacant or non-vacant positions for which she was qualified at 3M's Monrovia plant.  Specifically, the court found that, after Dr. Steinmann issued his February 7, 2012 permanent and stationary status report, Gonzalez was subject to two work restrictions: no overhead use of her right arm and no repetitive use of her upper right arm.  Based on its finding that Gonzalez could not perform any position at the Monrovia plant with or without accommodation, the court found that Gonzalez could not prevail as a matter of law on any of her FEHA, retaliation, or wrongful termination claims.  Finally, the court found there was no evidence that any 3M employee acted with malice, fraud, or oppression in terminating Gonzalez's employment from 3M.  Accordingly, the court granted 3M summary adjudication as to Gonzalez's request for punitive damages.

The court entered judgment in 3M's favor, and this timely appeal followed.

## DISCUSSION

Gonzalez contends triable issues of fact exist as to four of the six causes of action alleged in her complaint.  Specifically, Gonzalez argues that, based on the evidence before the trial court on 3M's motion for summary judgment, a reasonable jury could have concluded the following: (1) 3M impermissibly discharged her based on her physical disability; (2) 3M failed to reasonably accommodate her physical disability; (3) 3M failed to engage in a good-faith interactive process aimed at accommodating her

---

Accordingly, we consider Gonzalez's statements to which the trial court sustained 3M's objections to have been properly excluded and not part of the evidence from which a triable issue could be raised for purposes of summary judgment.  (See *Villanueva v. City Of Colton* (2008) 160 Cal.App.4th 1188, 1196 (*Villanueva*) ["'[W]here a plaintiff does not challenge the superior court's ruling sustaining a moving defendant's objections to evidence offered in opposition to the summary judgment motion, "any issues concerning the correctness of the trial court's evidentiary rulings have been waived. . . . We therefore consider all such evidence to have been 'properly excluded.'" [Citations.]'"].)

12

physical disability; and (4) 3M wrongfully discharged her in violation of public policy. On appeal, Gonzalez does not challenge the trial court's grant of summary adjudication as to her claims for retaliation and breach of the covenant of good faith and fair dealing. Gonzalez also does not challenge the court's grant of summary adjudication as to her request for punitive damages.

## I.      Standard of Review

On appeal from a grant of summary judgment, we review the record and the ruling of the trial court de novo. (*Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).) We consider all the evidence set forth in the moving and opposition papers, except that evidence to which objections have been made and sustained. (*Ibid.*) However, "[w]e do not resolve conflicts in the evidence as if we were sitting as the trier of fact. [Citation.] Instead, we draw all reasonable inferences from the evidence in the light most favorable to the party opposing summary judgment. [Citation.]" (*Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 961 (*Nadaf-Rahrov*).)

A grant of summary judgment is proper if the evidence set forth shows that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ Proc. § 437c, subd. (c); see also *Guz*, *supra*, 24 Cal.4th at p. 334.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted.)

For summary judgment in the employment discrimination context, "'"[i]f the employer presents admissible evidence either that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment *unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing. . . .*" [Citation.]'" (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 344 (*Arteaga*); italics in original.)

13

## II.    The FEHA Claims

Three of the four claims for which Gonzalez contends triable issues of material fact exist allege separate violations of FEHA.  (See § 12940, subds. (a), (m), & (n).)  Under FEHA, it is illegal for an employer, "because of the . . . physical disability . . . of any person, . . . to discharge the person from employment . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment."  (§ 12940, subd. (a).)  It is not illegal, however, for an employer to discharge an employee where, "because of his or her physical or mental disability, [the employee] is unable to perform his or her essential duties even with reasonable accommodation, or cannot perform those duties in a manner that would not endanger his or her health or safety . . . ."  (§ 12940, subd. (a)(1).)  To establish a prima facie case of disability discrimination, a discharged employee must establish that (1) she suffers from a disability; (2) she is otherwise qualified to do her job; and (3) she was subjected to adverse employment action because of her disability.  (*Arteaga*, *supra*, 163 Cal.App.4th at pp. 344-345.)

It is separately actionable under FEHA for an employer to fail "to make reasonable accommodation for the known physical or mental disability of an applicant or employee . . . ," unless to do so would create an undue hardship for the employer's operation.  (§ 12926, subd. (m); see also § 12926, subd. (u) [hardship defined].)  "The elements of a failure to accommodate claim are similar to the elements of a . . . [disability] discrimination claim . . . ."  (*Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 256 (*Jensen*).)  To establish a claim for failure to accommodate, a discharged employee must demonstrate (1) she has a disability under FEHA, (2) she is qualified to perform the essential functions of a relevant position, and (3) her employer failed to reasonably accommodate her disability.  (*Scotch v. Art Institute of California-Orange County, Inc.* (2009) 173 Cal.App.4th 986, 1009-1010 (*Scotch*).)

Finally, under section 12940, subdivision (n), it is separately actionable for an employer to fail "to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for

14

reasonable accommodation by an employee . . . with a known physical or mental disability or known medical condition." (§ 12940, subd. (n); *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 54 (*Gelfo*).) To prevail on a claim for failure to engage in a good-faith interactive process, "an employee must identify a reasonable accommodation that would have been available at the time the interactive process should have occurred." (*Scotch*, *supra*, 173 Cal.App.4th at p. 1018; see also *Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at p. 984.)

### A. *Reasonable Accommodation*

Gonzalez's challenge to the trial court's grant of 3M's motion for summary judgment primarily revolves around the court's determination that there was no triable issue as to whether Gonzalez was able to perform the essential functions of any position at 3M's Monrovia plant for which she was qualified, with or without accommodation. Under FEHA, once an employee notifies her employer of a physical disability, the employer must "take 'positive steps' to accommodate the employee's limitation . . . . [Citations.]" (*Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215, 1222 (*Raine*).) Once both parties are aware of the disability, they are expected to cooperate and exchange information with the goal of finding a suitable match between the employee's capabilities and the employer's available positions. (*Id.* at pp. 1222-1223, citing *Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 950 (*Prilliman*).)

FEHA requires the employer to provide its disabled employee with a "reasonable accommodation"; it does not require an employer to provide the disabled employee with "the best accommodation or the specific accommodation" the employee requests. (§ 12940, subds. (a) & (m); *Raine*, *supra*, 135 Cal.App.4th at p. 1223.) A reasonable accommodation is "a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired." (*Scotch*, *supra*, 173 Cal.App.4th at p. 1010.) This may include "(1) Making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities. [¶] [Or] (2) [j]ob restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or

15

modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." (*Ibid.*) A reasonable accommodation may also include a finite leave of absence. (*Jensen*, *supra*, 85 Cal.App.4th at p. 263; see also Cal. Code Regs., tit. 2, § 11068, subd. (c).) However, an employer is not obligated to hold a position open indefinitely while it waits for an employee's physical disability to be corrected. (*Hanson*, *supra*, 74 Cal.App.4th at pp. 226-227.)

"'If the employee cannot be accommodated in his or her existing position and the requested accommodation is reassignment, an employer must make affirmative efforts to determine whether [another] position is available. [Citation.] A reassignment, however, is not required if "there is no vacant position for which the employee is qualified." [Citations.]'" (*Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 766-767.) "'The responsibility to reassign a disabled employee who cannot otherwise be accommodated does "not require creating a new job, moving another employee, promoting the disabled employee or violating another employee's rights . . . ." [Citations.]'" (*Id.* at p. 767.)

To prevail on a claim under section 12940, subdivision (m), the employee bears the burden of proving the ability to perform the essential functions of a job with accommodation. (*Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at p. 977.) However, for an employer to prevail at the summary judgment stage on such a claim, it must establish through undisputed facts at least one of the following: "(1) [a] reasonable accommodation was offered and refused; (2) there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation; or (3) the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." (*Jensen*, *supra*, 85 Cal.App.4th at p. 263.)

Gonzalez contends the trial court erred in finding no triable issues of material fact exist as to whether 3M failed to reasonably accommodate her medical restrictions. First,

16

she argues 3M failed to establish that, at the time Dr. Steinmann issued the July 29, 2011 permanent and stationary status report, there were no other positions available at the Monrovia plant that could have accommodated her no-repetitive-use restriction. Second, she argues 3M failed to establish that it could not have modified any of the positions it considered as accommodations. Third, Gonzalez argues 3M failed to establish that it could not have converted any of the positions that it contracted with third parties to perform into a full-time accommodating position. Finally, she argues 3M failed to establish that it undertook a separate analysis to determine whether she could perform the essential functions of any positions at the Monrovia plant in light of the no-overhead-use restriction imposed by Dr. Steinmann in his February 7, 2012 permanent and stationary status report. We address these contentions in turn.

### i. *Availability of accommodating full-time positions between July 29, 2011 and February 7, 2012*

Gonzalez first contends the trial court erred in finding it was undisputed that 3M had no available full-time positions that she could perform with accommodation between the time Dr. Steinmann issued the first permanent and stationary status report on July 29, 2011 and the time he issued the second status report on February 7, 2012. Specifically, Gonzalez argues 3M's consideration of only five positions as potential accommodations did not establish that the company had no positions available that Gonzalez could perform with her no-repetitive-use restriction. We disagree.

First, at the time Dr. Steinmann issued the July 29, 2011 status report, Gonzalez could not perform the required tasks of her prior position, and 3M had no other positions available in *any* of its departments at its Monrovia plant. "[An] employer is not required to create new positions or 'bump' other employees to accommodate the disabled employee." (*McCullah v. Southern California Gas Co.* (2000) 82 Cal.App.4th 495, 501.) Accordingly, the fact that 3M considered only a limited number of non-vacant positions as potential future accommodations does not give rise to a claim for failure to reasonably accommodate when 3M had no positions available aside from Gonzalez's prior position, which she could no longer perform. (See *Spitzer v. Good Guys, Inc.* (2000) 80

17

Cal.App.4th 1376, 1389 (*Spitzer*) [an employer is not required to reassign an employee if "there is no vacant position for which the employee is qualified"].)

Second, Gonzalez admitted during discovery that 3M reasonably accommodated her medical restrictions by allowing her to remain on leave from the time Dr. Steinmann issued the July 29, 2011 status report up to the time he issued the second status report on February 7, 2012. On summary judgment, "[a]dmissions contained in depositions and interrogatories are admissible in evidence to establish any material fact." (*Leasman v. Beech Aircraft Corp.* (1975) 48 Cal.App.3d 376, 380.) A party opposing summary judgment cannot avoid her own prior admission obtained during discovery demonstrating that no factual issue exists by later submitting a sworn statement contradicting the prior admission. (*Prilliman*, *supra*, 53 Cal.App.4th at p. 961; see also *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21 (*D'Amico*) ["'Where, as here, however, there is a clear and unequivocal admission by the plaintiff . . . in his deposition . . . we are forced to conclude there is no *substantial* evidence of the existence of a triable issue of fact.' [Citation.]"]; *King v. Anderson* (1966) 242 Cal.App.2d 606, 610 [where plaintiff admits in prior deposition that the defendant used no force in an assault case, the plaintiff's statement in a later executed affidavit that the defendant in fact used unnecessary force does not create a triable issue of fact as to the force element of assault].)

During her deposition, Gonzalez admitted that she did not take issue with 3M's accommodation of her medical restrictions prior to the time Dr. Steinmann issued the second status report on February 7, 2012. She testified that 3M adequately accommodated her medical restrictions by allowing her to remain on medical leave after Dr. Steinmann issued the July 29, 2011 status report. She further testified that 3M satisfactorily engaged with her in dialogue about her medical condition during the period between July 29, 2011 and February 7, 2012. Further, it was undisputed that 3M had no positions available between that time period; 3M presented evidence that it had no positions available in July 2011 and January 2012, and Gonzalez presented no evidence to the contrary. Accordingly, Gonzalez cannot now argue that 3M failed to reasonably

18

accommodate her physical disability between July 29, 2011 and February 7, 2012 in order to raise a triable issue without citing evidence demonstrating that, during that period, 3M in fact had available positions that she could perform with accommodation. (See *D'Amico*, *supra*, 11 Cal.3d at p. 21.)

### ii. *Availability of accommodating modifications after July 29, 2011*

Gonzalez next contends 3M failed to establish that, after Dr. Steinmann issued the July 29, 2011 status report, no modifications could have been made to any of the positions Reyes and Nguyen reviewed to accommodate her no-repetitive-use restriction. We disagree.

3M presented sufficient evidence to establish no triable issue exists as to whether 3M could have modified any of the positions reviewed by Reyes and Nguyen to accommodate Gonzalez's no-repetitive-use restriction. In his declaration, Nguyen testified that he was not aware of any adequate modifications that could have been made to the four positions matching Gonzalez's qualifications and pay grade that he discussed with Reyes after the July 29, 2011 status report was issued. According to Nguyen, the essential tasks of each of these positions required the assigned worker to engage in repetitive movements with the worker's dominant arm. Specifically, Nguyen testified that each of these positions "revolved around manual tasks, such as assembling and packaging parts, setting up and adjusting equipment, operating machines and performing welding operations on small parts. [Those] jobs exist to perform the manual tasks, and the positions cannot be done without the manual tasks. . . . [A]n employee cannot do these manual tasks without constant and repetitive movement of their dominant arm, from the hand all the way to the shoulder." 3M properly relied on Nguyen's testimony about the essential duties of the positions he reviewed, as he was the manufacturing product manager in charge of the departments in which Gonzalez was qualified to work. (See *Hastings v. Department of Corrections* (2003) 110 Cal.App.4th 963, 968, fn. 6 ["Absent other evidence, we may properly rely on the employer's judgment and the written job description to determine the essential job functions."].)

19

Accordingly, the burden shifted to Gonzalez to produce evidence demonstrating that there was a disputed issue as to whether modifications could have been made to the positions reviewed by Reyes and Nguyen. (*Arteaga*, *supra*, 163 Cal.App.4th at p. 344.) Gonzalez produced no evidence to raise a triable issue as to whether any positions considered by Reyes and Nguyen that matched her qualifications and pay grade could have been modified to accommodate her restrictions. Although Gonzalez did testify in her deposition that she believed 3M could have modified the physical requirements of a welding position by allowing her to perform welding tasks without moving her upper right arm, this testimony was belied by her attempt to demonstrate such movements. After Gonzalez attempted to demonstrate these movements to 3M's counsel by trying to hold her upper right arm motionless while she moved only her right hand, the following exchange occurred between her and 3M's counsel:

"Q [3M's Counsel]: When I saw you do the small movements that you were saying you could do to weld, you shoulder moved; isn't that correct?

"A [Gonzalez]: But I can stick my arm closer to my body and not move it.

"Q: But when you showed me that movement just right now your shoulder moved, didn't it?

"A: Yes.

"Q: So even with keeping your arm close to your body welding, you would have had to move your shoulder repetitively; isn't that right?

"A: Yes."

Gonzalez presented no other evidence demonstrating that 3M could have modified any of the positions reviewed by Reyes and Nguyen such that she would have been able to perform the essential duties of those positions without having to engage in the repetitive use of her upper right arm.

### iii. *Availability of accommodating contract positions*

Gonzalez next contends 3M failed to establish that it could not convert any of the contract positions occupied by third-party employees into a new position that could accommodate her medical restrictions. Gonzalez argues a triable issue was created as to

20

whether 3M could have accommodated her medical restrictions by converting a contract position into a full-time position because she testified in her deposition that she believed she was capable of performing the essential duties of several of the assignments performed by contract workers. This argument lacks merit.

3M was under no legal obligation to vacate a contract position and convert it into a full-time assignment for Gonzalez. "[A]n employer has no duty . . . to accommodate a disabled employee by making a temporary accommodation permanent if doing so would require the employer to create a new position just for the employee." (*Raine*, *supra*, 135 Cal.App.4th at p. 1227.) As Nguyen testified, the contract positions identified by Gonzalez are positions in 3M's Monrovia plant that are filled by temporary contract employees of a third-party company. Although some of these positions require the contract employees to perform some tasks that are similar to those performed by 3M employees in full-time positions, these contract positions are not designated by pay grade (unlike 3M's full-time positions), and they do not require the temporary employees to perform all of the tasks required for a 3M full-time position that shares some of the same tasks. In other words, the contract positions do not completely correspond with 3M full-time positions in terms of duties and pay grade.

Nevertheless, Gonzalez contends 3M was required to convert one of these contract positions to a full-time position to allow her to maintain her 3M employee status. She is incorrect. As noted, an employer is not required to create a new position for a disabled employee to accommodate that employee's needs for lighter or modified duties. (See *Raine*, *supra*, 135 Cal.App.4th at p. 1227; see also *Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 982-983 (*Lui*) [employer has no duty to convert a position a disabled employee would not have been eligible to fill based on employment status into a permanent light-duty position to accommodate that employee's medical restrictions while allowing the employee to maintain the same pay status].) Further, Gonzalez presented no evidence that 3M has engaged in such conduct (converting contract positions into full-time positions for disabled employees) in the past. (See *Prilliman*, *supra*, 53 Cal.App.4th at pp. 950-951 ["[A]n employer who knows of the

21

disability of an employee has an affirmative duty to make known to the employee other suitable job opportunities with the employer and to determine whether the employee is interested in, and qualified for, those positions, . . . if the employer offers similar assistance or benefit to other disabled or nondisabled employees or has a policy of offering such assistance or benefit to any other employees."].)

### iv.    *Availability of accommodating full-time positions after February 7, 2012*

Finally, Gonzalez contends 3M failed to establish that it reasonably accommodated her disability after Dr. Steinmann reinstated her permanent and stationary status on February 7, 2012.  Specifically, she argues 3M had positions available that could accommodate the no-overhead-use restriction that Dr. Steinmann imposed in the February 7, 2012 status report.  In making this argument, Gonzalez asserts that after Dr. Steinmann issued the second status report, she was subject to only the no-overhead-use restriction because Dr. Steinmann had lifted the no-repetitive-use restriction on January 5, 2012, and he never put the restriction back into effect when he issued the February 7, 2012 status report.  According to Gonzalez, after February 7, 2012, she was capable of performing any of the positions outlined in 3M's job descriptions that matched her pay grade and did not require her to perform tasks involving the overhead use of her right arm.  Accordingly, she claims a triable issue exists as to whether 3M could have reasonably accommodated her no-overhead-use restriction between the time Dr. Steinmann issued the second status report on February 7, 2012 and the time she was terminated on August 13, 2012.

In support of her opposition to 3M's motion for summary judgment, Gonzalez produced job descriptions for 14 positions at 3M's Monrovia plant within her pay grade. Each of those 14 positions required the assigned worker to engage in either the overhead or repetitive use of her arms; four required only the repetitive use of the worker's arms; one required only the overhead use of the worker's arms; and 9 required both the overhead and repetitive use of the worker's arms.  Gonzalez argues, without citing to any supporting evidence, that she could have performed the essential duties of the four

22

positions requiring only the repetitive use of her arms at the time 3M terminated her employment on August 13, 2012.[6] We disagree.

Even drawing all inferences from the evidence in Gonzalez's favor, there is no evidence that Gonzalez was physically capable of performing, with or without accommodation, any position that required her to engage in the repetitive use of her right arm. As of July 29, 2011, Dr. Steinmann had determined that Gonzalez had reached a point of maximum medical improvement. At that time, Gonzalez complained that she was still experiencing pain in her right arm, right shoulder, and the right side of her neck. This complaint was consistent with Gonzalez's status more than a year earlier, when she was placed on medical leave in February 2010 because she could not bear the pain she experienced in the same parts of her body despite 3M's efforts to rotate her through assignments that allowed her to alternate between different tasks and physical positions. As a result of Gonzalez continuing to experience severe pain in her arm, shoulder, and neck up through July 2011, Dr. Steinmann precluded her from engaging in work that would require her to make repetitive movements with her upper right arm.

There is no evidence demonstrating that, from the time Dr. Steinmann's July 29, 2011 status report was issued until the time Gonzalez's employment was terminated on August 13, 2012, Gonzalez's physical condition had improved to enable her to engage in repetitive tasks involving her upper right arm. On September 15, 2011, Gonzalez wanted to return to work so she requested that Dr. Steinmann lift her medical restrictions. Dr. Steinmann refused Gonzalez's request because her condition was permanent, and he believed that allowing her to reengage in her prior work at 3M would exacerbate her injuries. On January 5, 2012, Dr. Steinmann issued a report clearing Gonzalez to return

---

[6] Gonzalez appears to rely on her declaration testimony that she believed she could have performed the essential functions of certain assembly-line positions at 3M. However, as we already noted, that testimony was excluded by the trial court, and Gonzalez does not challenge that evidentiary ruling on appeal. Accordingly, we consider those statements to have been properly excluded by the trial court. (See *Villanueva*, *supra*, 160 Cal.App.4th at p. 1196.)

23

to work without restrictions. According to Dr. Steinmann, Gonzalez had convinced him that she no longer experienced pain when she engaged in the type of work that she had previously performed at 3M. However, Dr. Steinmann changed his opinion one month later, when he issued the February 7, 2012 report. The report was issued after Gonzalez returned to Dr. Steinmann's office complaining that she could not work for more than five minutes without experiencing excruciating pain. According to Dr. Steinmann, he had been mistaken about Gonzalez's condition when he issued the January 5, 2012 report because he relied on her statements that she would be able to return to work without pain despite her injuries. However, after she returned to his office in February 2012 complaining of unbearable pain, he formed the opinion that Gonzalez had become unreliable in describing her own symptoms. Because Gonzalez continued to experience excruciating pain in her arm and shoulder, Dr. Steinmann placed Gonzalez back at her previous permanent and stationary status. Although Dr. Steinman did not explicitly reinstate the no-repetitive-use restriction in the February 7, 2012 status report, there is no indication from that report, or any other evidence outside the January 2012 reports that Dr. Steinmann later discredited, that Gonzalez's condition had improved since July 29, 2011 such that she could engage in the repetitive use of her right arm.

Indeed, in issuing the February 7, 2012 status report, Dr. Steinmann stated that he would like to amend his January 5, 2012 report and place Gonzalez at her "previous permanent and stationary status." Gonzalez was placed on permanent and stationary status only one time prior to February 7, 2012, which was when Dr. Steinmann issued the July 29, 2011 status report. Accordingly, without any independent evidence indicating that Gonzalez's condition had actually improved, the only reasonable inference from Dr. Steinmann's decision to reinstate Gonzalez's *previous* status of maximum medical improvement in February 2012 is that her condition had not changed since that previous status was originally imposed in July 2011. (See *Hanson*, *supra*, 74 Cal.App.4th at p. 220, fn. 2 [a disability is considered permanent once the employee has reached maximum medical improvement].)

24

Finally, Gonzalez's own testimony established that she was subject to both the no-repetitive-use and no-overhead-use restrictions at the time she was terminated. During her deposition, Gonzalez testified that, after Dr. Steinmann issued his final status report on February 7, 2012, she was subject to both the no-overhead-use and no-repetitive-use work restrictions.[7]

In light of the foregoing, we conclude that the trial court properly granted summary adjudication in favor of 3M as to Gonzalez's claim for failure to reasonably accommodate under FEHA. From February 2010 until the time Gonzalez was terminated in August 2012, 3M accommodated Gonzalez's physical disability and medical restrictions by allowing her to remain on medical leave for nearly two and a half years. (See *Jensen*, *supra*, 85 Cal.App.4th at p. 263 [a finite leave of absence to allow an employee to recover is a reasonable accommodation]; *Hanson*, *supra*, 74 Cal.App.4th at p. 226 [an employer is not required to allow a disabled employee to remain on unpaid leave indefinitely where there is no indication the employee will be able to perform the essential duties of an available position with or without reasonable accommodation].) With respect to the period between July 29, 2011 and February 7, 2012, Gonzalez admitted that 3M reasonably accommodated her restrictions by allowing her to remain on medical leave. With respect to the period between February 7, 2012 and August 13, 2012, the undisputed evidence demonstrates that Gonzalez's medical condition had never improved from the time she was first prescribed permanent medical restrictions in July 2011. Gonzalez presented no evidence demonstrating that, after Dr. Steinmann issued the second status report on February 7, 2012, 3M had positions available that she could

---

[7]     Gonzalez attempts to contradict this testimony and argue a triable issue exists as to whether she was in fact capable of performing repetitive manual tasks after Dr. Steinmann issued the February 7, 2012 report by citing to the statements in her declaration to which the trial court sustained 3M's objections. As already noted, we consider those statements to have been properly excluded and not part of the evidence from which a triable issue could be raised on summary judgment. (See *Villanueva*, *supra*, 160 Cal.App.4th at p. 1196.)

25

perform with accommodation. Accordingly, the trial court correctly found that no triable issue exists as to whether 3M reasonably accommodated Gonzalez's medical restrictions before terminating her employment.

### B. Interactive Process

Under FEHA, an employer is obligated "to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability or known medical condition." (§ 12940, subd. (n); see also *Scotch*, *supra*, 173 Cal.App.4th at p. 1003.) Gonzalez contends that 3M failed to establish that it participated in a good-faith interactive process because 3M did not engage Gonzalez in a meaningful dialogue on such issues as what positions 3M initially considered as accommodations for Gonzalez's no-repetitive-use restriction imposed by Dr. Steinmann in July 2011; why 3M did not convert one of its contract positions into a full-time position for Gonzalez; and what positions, if any, 3M had available that could accommodate Gonzalez's no-overhead-use restriction imposed in February 2012.

"Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, . . . the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." (*Scotch*, *supra*, 173 Cal.App.4th at p. 1013.) When an employer becomes aware of one of its employee's disabilities, it has "an affirmative duty to make known to the employee other suitable job opportunities with the employer and to determine whether the employee is interested in, and qualified for, those positions, if the employer can do so without undue hardship . . . ." (*Prilliman*, *supra*, 53 Cal.App.4th at pp. 950-951.) An employer's failure to engage in a good faith interactive process gives rise to an action under FEHA separate from an employer's failure to reasonably accommodate an employee's disability. (*Gelfo*, *supra*, 140 Cal.App.4th at p. 54; see also *Scotch*, *supra*, 173 Cal.App.4th at p. 1003.)

Where, as here, the parties have engaged in the litigation process, including conducting discovery, to prevail on a claim for failure to engage in a good-faith interactive process, "the employee must be able to identify an available accommodation the interactive process should have produced . . . ." (*Scotch*, *supra*, 173 Cal.App.4th at p. 1018.) "Section 12940[, subdivision] (n), which requires proof of failure to engage in the interactive process, is the appropriate cause of action where the employee is unable to identify a specific, available reasonable accommodation while in the workplace and the employer fails to engage in a good faith interactive process to help identify one, but the employee is able to identify a specific, available reasonable accommodation through the litigation process."[8] (*Id*. at pp. 1018-1019, quoting *Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at p. 984.)

Here, the trial court properly granted summary adjudication in 3M's favor on Gonzalez's interactive-process claim. As we concluded above, Gonzalez admitted during discovery that 3M reasonably accommodated her medical restrictions prior to February 7, 2012 by allowing her to remain on medical leave while the parties waited for Gonzalez to recover or for an accommodating position to become available. Further, after initiating litigation and engaging in discovery, Gonzalez identified no available position, or modification to an available position, that could have accommodated her no-repetitive-use and no-overhead use restrictions between February 7, 2012 and August 13, 2012, when her employment was terminated. Accordingly, Gonzalez could not succeed on a claim for failure to engage in a good-faith interactive process under section 12940, subdivision (n). (See *Scotch*, *supra*, 173 Cal.App.4th at pp. 1018-1019.)

---

[8]     We note that 3M's counsel cited a nonpublished opinion in arguing that, to raise a triable issue as to her interactive-process claim, Gonzalez was required to identify an available position at 3M that could accommodate her disability once the parties conducted discovery. While we ultimately agree with 3M that Gonzalez was required to identify an available position (see *Scotch*, *supra*, 173 Cal.App.4th at p. 1018), the nonpublished opinion should not have been cited. (See Cal. Rules of Court, rule 8.115(a).)

### C. *Disability Discrimination*

Finally, FEHA prohibits an employer from discharging an employee on the basis of a physical disability. (§ 12940, subd. (a).) Gonzalez contends the trial court erred in granting summary adjudication on her discrimination claim because 3M admitted that it terminated her employment because her disability leave had expired, thereby establishing a discriminatory intent.

As noted above, the elements of a disability discrimination claim are: (1) the employee suffers from a disability; (2) the employee is otherwise qualified to perform her job; and (3) the employee was subjected to adverse employment action because of her disability. (*Arteaga*, *supra*, 163 Cal.App.4th at pp. 344-345.) To prevail on a claim for disability discrimination, a discharged employee must establish not only that she was discharged because of a disability, but also that she could have performed the essential functions of an available job with or without accommodation. (*Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at p. 962.) Accordingly, FEHA does not prohibit an employer from discharging an employee with a physical disability if the employee, because of her physical disability, "is unable to perform . . . her essential duties even with reasonable accommodations . . . . [Citation.]" (*Lui*, *supra*, 211 Cal.App.4th at p. 971.)

With respect to the first element of Gonzalez's disability discrimination claim, neither party disputes that Gonzalez suffered from a physical disability throughout the entire period relevant to her claim. Accordingly, the pertinent issue is whether 3M established there was no triable issue as to whether Gonzalez could have performed the essential functions of an available, non-promotional position. (See *Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at p. 963.) 3M satisfied this burden. As we concluded above, there were no positions available at 3M that Gonzalez could have performed with or without accommodation for her no-overhead-use and no-repetitive-use restrictions at the time she was terminated. Because 3M had no positions available that Gonzalez could have performed with or without accommodation, Gonzalez cannot prevail on her disability-

28

discrimination claim under FEHA.  (See *ibid*.)  Accordingly, the trial court properly granted summary adjudication in 3M's favor as to that claim.[9]

## DISPOSITION

The judgment is affirmed.  The parties are to bear their own costs on appeal.

**WOODS, Acting P. J.**

**We concur:**

**ZELON, J.**                                              **FEUER, J.**[*]

---

[9]     We do not separately address in detail the propriety of the trial court's grant of summary adjudication as to Gonzalez's wrongful-termination claim.  Gonzalez cites no authority addressing the elements or legal standards applicable to a claim for wrongful termination.  (See *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["An appellate court is not required to examine undeveloped claims, nor to make arguments for parties."].)  Further, she devotes no separate discussion to the merits of her wrongful termination claim; rather, she relies entirely on her discussion of her FEHA claims to argue that the trial court also improperly granted summary adjudication in 3M's favor as to her claim for wrongful termination.  Because we hold the trial court properly granted summary adjudication in 3M's favor as to Gonzalez's FEHA claims, we likewise hold that the trial court properly granted summary adjudication as to her claim for wrongful termination.

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.